1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

HAZEL I. CRUZ VAZQUEZ, et          Civ. No. 08-1236 (JP)
al.

          Plaintiffs
        vs.

MENNONITE GENERAL HOSPITAL,
et al.                             Hato Rey, Puerto Rico
                                   April 2, 2009

          Defendant(s)

**DAUBERT HEARING**
**PARTIAL TRANSCRIPT: TESTIMONY DR. CARLOS RAMIREZ**
BEFORE THE HONORABLE JUDGE JAIME PIERAS
FEDERAL BUILDING, HATO REY, PUERTO RICO

APPEARANCES:

For the Plaintiff:          Jose Ortiz Velez, Esq.
                            Pedro Soler Muniz, Esq.

For the Defendant:          Anselmo Irizarry Irizarry, Esq.
                            Jose Hector Vivas, Esq.
                            Jose Miranda Daleccio, Esq.
                            Humberto Vazquez Sandoval, Esq.
                            Gilda Cruz Martino, Esq.

Court Interpreter:          N/A

2

```
1                    P R O C E E D I N G S

2                                      (10:54 a.m.)

3           (Transcript commences at Daubert Hearing)

4           COURTROOM MARSHAL:  [You may be seated]

5             MR. SOLER MUÑIZ:  May it please the Court?

6             THE COURT:  Go ahead.

7             MR. SOLER MUÑIZ:  Attorney Pedro Soler for

8  the record.

9     (Carlos Eduardo Ramírez González, Plaintiff Witness)

10 DIRECT EXAMINATION

11 BY MR. SOLER MUÑIZ:

12 Q.      Good morning.

13 A.      Good morning.

14 Q.      Could you please state your full name?

15 A.      Carlos Eduardo Ramírez González.

16 Q.      What is your age?

17 A.      I am 52.

18 Q.      What is your civil status?

19 A.      I'm married.

20 Q.      To whom?

21 A.      To Doreen Sylvia Ringer.

22 Q.      What is your actual address?

23 A.      I live in Fortaleza El Covaleno in Cupey.

24 That is in road 176 corner with 177.

25 Q.      Could we talk about your education, please?
```

1   A.        Yes.

2   Q.        Let's start with what education you received

3   after high school.

4   A.        Well, after I graduated from Colegio San

5   Antonio in Río Piedras, I went to the University of

6   Puerto Rico, Río Piedras campus, where I did premed.

7   Q.        Where you did what?

8   A.        A premedical three-year program in order to

9   get into medical school.

10           I went into medical school in 1977 to the

11  Recinto de Ciencias Médicas in the Puerto Rico Medical

12  Center.

13           THE COURT:  You graduated in 77 as a Doctor?

14           THE WITNESS:  No.  I graduated in 1981 as a

15  Doctor.

16           THE COURT:  And, in 77, what happened?

17           THE WITNESS:  I -- I was enrolled in the

18  medical school.

19           THE COURT:  Premed?

20           THE WITNESS:  Yeah.  With premed.  And they

21  gave me the --

22           THE COURT:  And where you did there three

23  years?

24           THE WITNESS:  Yes.

25           THE COURT:  And then, immediately, you went

1    to the -- to the medical school?

2            THE WITNESS:  I went to medical school.  And,

3    after my first year, I was awarded a bachelor's degree

4    in science, in general science, as a special program of

5    the University of Puerto Rico.

6    BY MR. SOLER MUÑIZ:

7    Q.        What is that special program?

8    A.        Well, if you get admitted to medical school

9    without completing your bachelor's degree, after the

10   first year of completion of your medical school, they

11   convalidate that year as your fourth year of college,

12   and they give you a bachelor's degree.

13   Q.        Okay.  Go on, please, Doctor.

14   A.        But I graduated in 1981 and did a straight

15   internship in obstetrics and gynecology.

16   Q.        What does a straight internship mean?

17   A.        A straight internship is an internship

18   dedicated basically to one specialty in particular.

19   And mine was in obstetrics and gynecology at the

20   University Hospital.

21           THE COURT:  You got your M.D. in 1981?

22           THE WITNESS:  Yes.

23           THE COURT:  M.D.?

24           THE WITNESS:  Yes.

25           THE COURT:  Then internship where?

5

1              THE WITNESS:  University Hospital at the

2   Puerto Rico Medical Center.

3              THE COURT:  Specialty?

4              THE WITNESS:  I did my specialty at the

5   University Hospital, in the same program, --

6              THE COURT:  Actual?

7              THE WITNESS:  -- in obstetrics and

8   gynecology.  And I finished in 1985.

9              THE COURT:  Go ahead.

10             MR. SOLER MUÑIZ:  Okay.

11   BY MR. SOLER MUÑIZ:

12   Q.        Where did you do that residency in obstetrics

13   and gynecology?

14   A.        At the University Hospital in the Puerto Rico

15   Medical Center.

16   Q.        Okay.  What did you do there during your

17   residency?  Could you -- could you please tell me what

18   -- what sort of tasks or things you would do as a

19   resident?

20   A.        Well, as a residence, you have a core

21   curriculum that is standard for all accredited

22   residencies in obstetrics and gynecology, where you

23   rotate through obstetrics, through labor room, through

24   general gynecology, through gynecologic cancer.

25             You can do electives in urology.  You can do

6

1    it in anesthesia.  You do some pathology and internal

2    medicine.

3           And you graduate with a base -- you finished

4    your program, and you are board qualified after you

5    complete certain requirements in terms of months in

6    order for you to take the Board.

7    Q.      And what are those requirements in order for

8    you to take the Board?

9    A.      Well, there is a minimum requirement of, I

10   think it was eight months of general obstetrics, eight

11   months of labor room, eight months in gynecology, for a

12   total of more or less 42 months of requirements.

13          And the other months, the other six or seven

14   months, are in electives.

15   Q.      Okay.  Let's go one by one of the ones that

16   you mentioned.  You mentioned labor room, correct?

17   A.      Yes.

18   Q.      What is that labor room?

19   A.      Well, labor room is where the patients in

20   labor go, the ones who are having their babies.

21          At the University, when I was a resident, the

22   half of the population there was general obstetrics,

23   which means obstetrics -- non complicated obstetric

24   patients.

25          And the other half we attended for the

1   population of Puerto Rico at that time the high risk

2   pregnancies that went there, that included premature

3   labors, preeclampsia, the whole book.

4   Q.        Okay.  And what is premature labor?

5   A.        Well, premature labor is a patient who goes

6   into labor before the 37th week of pregnancy

7   basically,--

8   Q.        Perform a --

9   A.        -- the 37th week of pregnancy by definition.

10  Q.        And how many of those patients did you treat

11  as a resident there in the premature labor patients?

12  A.        As a resident, around 500 approximately --

13  you're talking about premature?

14  Q.        Premature.

15  A.        Yeah.

16  Q.        And how many that would not be premature, of

17  the regular population?

18  A.        Thousands.

19  Q.        Okay.  And you finished your residency at the

20  San Juan Municipal Hospital in what year?

21  A.        I didn't really finish in San Juan City

22  hospital.  I finished in the University.

23  Q.        I'm sorry.  In the University.

24  A.        Yes.

25  Q.        In what year?

8

1    A.          In 1985.

2    Q.          Okay.  And what did you do next?

3    A.          I stayed as a part-time faculty member in the

4    Department of obstetrics and gynecology --

5    Q.          Okay.

6    A.          -- of the University of Puerto Rico --

7    Q.          And then --

8              THE COURT:  Part-time?

9              THE WITNESS:  Excuse me?

10             THE COURT:  You were a part-time professor?

11             THE WITNESS:  Yeah.  A 20 hour, half --

12             THE COURT:  Faculty member?

13             THE WITNESS:  Yes.

14   BY MR. SOLER MUÑIZ:

15   Q.          And will you tell us what that faculty member

16   entailed?

17   A.          Well, it was about supervision of residents,

18   preparing lectures, attending schooling, doing

19   research.          I was assigned the labor room, as

20   the attending of the labor room and the emergency room

21   on Tuesdays.

22             Basically, that was what we did.

23   Q.          Okay.  And what were your duties in charge

24   of the labor room?

1   A.          Well, my duties in charge of the labor room

2   was supervising and counseling and teaching residents

3   on -- on the patients that we had there for the day.

4               We had to supervise the operations that were

5   on the labor room, operating room, the Cesarean

6   sections, sterilizations', D&C's, delaspes (sic).

7   Q.          And what else if anything did you do besides

8   being a part-time professor there?

9   A.          Well, I had my -- my practice.  At that time,

10  it was Dr. Teresa Mangual.

11              THE COURT:  What's happening here with the

12  microphones?

13              COURTROOM CLERK:  Somebody's --

14      (There is a short pause in record)

15              THE COURT:  Alright.  Go ahead.

16              That's important.  But I won't think to call

17  them up there if you prepare a transcript.

18              MR. SOLER MUÑIZ:  Yes.

19              THE COURT:  Alright.  Go ahead.

20              MR. SOLER MUÑIZ:  Okay.

21  BY MR. SOLER MUÑIZ:

22  Q.          Doctor, you were stating that you had a

23  practice.

24  A.          Yeah.

25  Q.          Go ahead.

1   A.          We established a practice in general

2   obstetrics and gynecology in 1985 at the El Amal

3   building on [Piñeiro Avenue] for the purpose of

4   treating private patients in obstetrics and gynecology.

5   Q.          Okay.  And for how long did you have that

6   practice at that location?

7   A.          At that location, I stayed until 1997, when I

8   moved to Plaza Las Américas.

9   Q.          Okay.  And there --

10          THE COURT:  Until 1987?

11          THE WITNESS:  97.  1997, we moved -- I moved

12   to [Tower] Plaza Las Américas.

13   BY MR. SOLER MUÑIZ:

14   Q.          And at what -- at that location, with -- with

15   whom else if anyone did you practice?

16   A.          At the El Amal?

17   Q.          Yes.

18   A.          Yes.  Well, Teresa left for a teaching

19   position in the United States in 19 --

20   Q.          Who -- what -- what Teresa?

21   A.          Teresa Mangual.

22   Q.          Okay.

23   A.          She left, and then I --

24   Q.          Who was she?

1   A.        Huh?  She was a classmate of mine from the

2   University Medical School in the obstetrics and

3   gynecology department.

4   Q.        Okay.

5   A.        We did a practice, a combined practice, a

6   group practice.

7   Q.        Who else was part of the group?

8   A.        After Teresa left, I stayed for some time

9   alone, and then Alberto de la Vega and Jesús Cadbury

10  was -- joined us, or me.

11            They had their separate practice, and we had

12  a society, a partnership of expenses.

13  Q.        Okay.  Have you seen Alberto de la Vega

14  lately?

15  A.        Yes.  I saw him yesterday.

16  Q.        Who is he?

17  A.        He is the gentleman who's sitting in the

18  middle of the second row with the Defendant.

19  Q.        Could you -- could you -- could you please

20  point to him?

21  A.        Yes.

22        (This is done)

23            THE COURT:  Could you please stand up.

24        (This is done)

25            THE COURT:  Alright.

CERTIFIED TRANSCRIBERS INC.
1075 Carr.  2 Cond.  Plaza Suchville #302
Bayamon, Puerto Rico 00959
Tel. # (787)783-6623

1  BY MR. SOLER MUÑIZ:

2  Q.        Do you -- do you know what participation if

3  any he has in this case?

4  A.        Well, he's an expert witness for the defense.

5  Q.        And he was part of the group that you

6  practice in at El Amal?

7  A.        Yes.  Yes.  For some time.

8  Q.        Okay.  Then, was he your student at any point

9  in time?

10  A.        He was my co resident when I was a resident.

11  And, when I graduated, he graduated about three years

12  after.  I think he was my intern when I was a senior

13  resident.

14  Q.        And where was that?

15  A.        At the University Hospital.

16  Q.        Okay.  What kind of patients did you -- did

17  you take care of, did you treat while you were at the

18  practice, your practice at El Amal?

19  A.        Well, at the El Amal, I treated obstetric

20  patients until Teresa left.

21          Afterwards, I had done my special training in

22  obstetrics surgery, and I was more dedicated to

23  gynecology and cancer patients.

24  Q.        Okay.

1  A.        So, I was not doing obstetrics at El Amal.  I

2  started doing obstetrics again in 1994 as part of the

3  Puerto Rico health reform, because I was in another

4  group practice that attended patients from the Arecibo

5  area of the health reform.

6  Q.        Okay.  Tell us something more about --

7          THE COURT:  Let me be sure I've got this

8  straight

9          THE WITNESS:  Yes.

10          THE COURT:  You could do obstetrics to who?

11          THE WITNESS:  In 1988, I quit.

12          THE COURT:  In 1988?

13          THE WITNESS:  In 88, as in prior practice.  I

14  continued at the University, but I did not see any

15  obstetric patients in my private office.

16          THE COURT:  Thank you.

17          MR. SOLER MUÑIZ:  Okay.

18  BY MR. SOLER MUÑIZ:

19  Q.        So, did you quit or not obstetrics in --

20  completely in 1998?

21  A.        88.

22  Q.        Yes.

23  A.        88, I quit for some years, and I was offered

24  a position in a group practice that was going to be

25  taking care of patients of the health reform --

14

1  Q.        Okay.

2  A.            -- in the Arecibo area.  And I was based in

3  Manatí.

4  Q.        Where was that prac -- with whom did you

5  practice there?

6  A.        Well, we -- there was Dr. Ángel Gelpi Guzmán

7  was the director of the group.

8            Carlos Blanco Ramos was the director of the

9  IPA that was taking care of various IPA's there at the

10 Doctors Center in Manatí.

11 Q.        What is -- what is an IPA?

12 A.        An independent practitioners association,

13 which is a group that is combined with -- composed of

14 pediatricians, obstetricians, general practitioners,

15 for the purpose of offering services to a managed-care

16 program.

17 Q.        Okay.  What did you do in the hospital from

18 1988 through 1992?

19 A.        In the --

20 Q.        I'm sorry.  In the University.

21 A.        Well, I -- I kept my same duties, with the

22 addition that I was --

23 Q.        Which -- which were what?

24 A.        Well, the supervision of residents, the

25 teaching, supervision of the labor room.

1          And then, I was appointed director of the

2    division of gynecological oncology in 1988, after a

3    passed the Boards.

4    Q.        Okay.

5              THE COURT:   Director of what?

6              THE WITNESS:   Gynecologic oncology.   That's

7    the treatment of women with gynecologic cancer.

8    BY MR. SOLER MUÑIZ:

9    Q.        What other duties were you provided at the

10   University?

11   A.        Well, we had a relationship with the

12   oncological hospital, which was the main base for

13   cancer patients, and I was also assigned as a member of

14   the faculty to the oncologic hospital.

15             In addition to seeing obstetric and

16   gynecologic patients and operating, etc..

17   Q.        Okay.   And the practice in Arecibo, --

18   A.        Yes?

19   Q.        -- what kind of patients did you see there?

20   A.        Well, we see -- we saw about half of the

21   patients were obstetric patients, and we had a locale

22   dedicated to obstetric patients, with sonograms and

23   everything like that.

24             And we also saw gynecologic -- general

25   gynecologic patients.

1    Q.        And until what time did you practice there?

2    A.        I left there in February 2002.

3    Q.        Of 2000?

4    A.        2.

5    Q.        Okay.  What kinds of obstetric patients did

6    you -- did you see there?

7    A.        Everything.  Everything.

8              Most of them were uncomplicated obstetric

9    patients, but some had diabetes, some had other

10   conditions, twin pregnancies, congenital malformations,

11   premature labors, you name it.

12             It's a high risk population, because it's

13   from a low socioeconomic status.  And, obviously, they

14   have higher complication rates.

15   Q.        Okay.  How many obstetric patients did you

16   treat there at the Arecibo practice?

17   A.        Well, thousands.  It was an eight year

18   period, and we saw 40 patients a day, two days a week.

19   So, do the math.

20   Q.        Okay.  Where else if anywhere did you

21   privately practice medicine?

22   A.        Well, in private practice, I -- after I left

23   El Amal, I went to Plaza Las Américas, the Tower, where

24   I shared an office with Dr. John Pagán who is -- who is

25   a plastic surgeon.

17

1    Q.         And what did you do there?

2    A.         Well, I did there the same as I did in El

3    Amal after I left obstetrics.  I saw gynecology

4    patients, cancer patients.

5    Q.         Okay.

6    A.         And that was until September of 2000 I think.

7    Q.         What happened in 2002?

8               THE COURT:  So, you left this office?

9               THE WITNESS:  Well, I left the office -- it

10   was in 2000, because I was diagnosed with cancer.

11   BY MR. SOLER MUÑIZ:

12   Q.         When were you diagnosed with cancer?

13   A.         At the end of 2000.

14   Q.         And what happened?

15   A.         Well, I left the private practice.  I didn't

16   know what was going to happen.  I have to dedicate

17   myself to my treatment.

18   Q.         What kind of cancer did you have?

19   A.         Throat cancer.

20   Q.         Okay.

21              THE COURT:  What kind?

22              THE WITNESS:  Throat cancer.

23              Then, I stayed at the oncologic hospital.

24   There was an office I could see private patients.  Some

25   of them went with me there; some, didn't.

1          But I maintained a private practice at the

2    oncologic hospital.

3          At the beginning, everything was going

4    smoothly, and, then, in 2003, I had a relapse.  And I

5    decided to take a sabbatical to take care of my health

6    and to write the book I had begun about the treatment

7    of cancer patients.

8          MR. SOLER MUÑIZ:  Okay.

9    BY MR. SOLER MUÑIZ:

10   Q.        In terms of certifications that you may have,

11   do you have any?

12   A.        Well, I have the special qualification in

13   pelvic surgery, which I did in an affiliation with

14   University of Alabama at Birmingham.  And I was --

15         THE COURT:  Well, you're going too fast.

16   Because, remember, you'll probably think I'm a doctor,

17   but I'm not.  So, certification in what?

18         THE WITNESS:  Well, I did a special

19   certification in pelvic surgery.

20         THE COURT:  In what surgery?

21         THE WITNESS:  Yes.

22         THE COURT:  What -- what kind of surgery?

23         THE WITNESS:  Pelvic surgery.

24         THE COURT:  Pelvic surgery?

25         THE WITNESS:  Yes.

1          THE COURT:  Yes.  Go on.

2          THE WITNESS:  Go ahead?

3          THE COURT:  Go ahead.

4          THE WITNESS:  Well, --

5          THE COURT:  He finished my -- he answered me.

6

7          MR. SOLER MUÑIZ:  Okay.

8    BY MR. SOLER MUÑIZ:

9    Q.        So, where did you do that specialty in pelvic

10   surgery?

11   A.        Well, the -- it was a collaborative with the

12   University of Alabama in Birmingham.  They did a cancer

13   patients, cervical cancer patients, and I needed

14   training in -- in pelvic surgery.

15          So, we did a quid pro quo.  They came here,

16   and I went there, and they gave me the certification.

17   Q.        Okay.  And -- and -- and what did you do

18   within that program?

19   A.        Well, it extended my abilities as a

20   gynecologic surgeon to -- to having training in

21   urologic surgery, as well as abdominal and

22   gastrointestinal surgery, which is -- are organs that

23   are within the pelvis, and, doing cancer surgery, you

24   may have to do procedures on them.

20

1              So, they gave me the special training to do

2    that.

3              THE COURT:   What year was that, Doctor?

4              THE WITNESS:   1987.

5              THE COURT:   When they certified you?

6              THE WITNESS:   Then, they gave me privileges

7    at the University, at the University Hospital in the

8    oncologic hospital, to do procedures in addition of

9    gynecology, in general surgery procedures and urology

10   procedures.

11             THE COURT:   Go ahead.

12   BY MR. SOLER MUÑIZ:

13   Q.        In terms -- in terms of the oncologic

14   Hospital, --

15   A.        Yes?

16   Q.        -- could you tell us what were your duties

17   there?

18   A.        Well, I was a -- first, the faculty, and then

19   I --

20   Q.        What is faculty?

21   A.        I -- it's a member of the hospital -- of the

22   faculty of a hospital which is composed of doctors of

23   various specialties.  And I began as a general

24   attending there.  It's also a teaching hospital.

1          I became director of gynecologic -- of

2    gynecology there in 1993 and was there for 10 years.

3    In 1993, I was also named president of the medical

4    staff, a position I held for five years.

5    Q.          What is president --

6              THE COURT:   Medical staff of what?

7              MR. SOLER MUÑIZ:   Yes.

8    BY MR. SOLER MUÑIZ:

9    Q.          What is President of medical staff -- medical

10   staff of where?

11   A.          Of the oncologic hospital.

12   Q.          Okay.  And what is that?  That President of

13   the medical staff?

14   A.          That's the people who have active privileges

15   within the institution are called the medical staff.

16            There are dentists, there are radio

17   therapists, there are surgeons, there are

18   cardiologists.  And they named me as president of that

19   staff.

20              THE COURT:   The radiologists, okay (sic).

21              THE WITNESS:   The oncologic hospital is

22   within the medical center.  It is east of the medical

23   school.

24   BY MR. SOLER MUÑIZ:

1 Q.        And what were your duties there as president

2 of the medical staff?

3 A.        Well, as president of the medical staff, I

4 was the liaison between and the administration, the

5 board of directors, and the faculty.  I presided the

6 executive committee of the hospital, and, obviously, my

7 duties as a staff member.

8 Q.        What were your duties as staff member?

9 A.        Well, I saw every new cancer patient that

10 came in.  I -- I evaluated, and I was, like, the

11 screener.

12         I operated on the patients that arrived with

13 cancer.  I distributed the patients according to

14 criteria to the other gynecologists who practiced

15 there.  I supervised the clinics.  I gave teaching to

16 the various residency programs that rotated in -- in

17 the oncologic hospital.

18 Q.        Okay.  How long did you teach students about

19 obstetrics and gynecology at the University?  For how

20 long?

21 A.        It was about 26 years.

22 Q.        Okay.

23         MR. VIVAS:   Excuse me.  I didn't get the

24 answer.

25         THE WITNESS:  26 years more or less.

1              MR. VIVAS:   26?

2              THE WITNESS:  Yes.

3              MR. SOLER MUÑIZ:   Teaching students of

4    obstetrics and gynecology.

5    BY MR. SOLER MUÑIZ:

6    Q.        And what is your current standing with the

7    university today?

8    A.            Well, as I said, I took a sabbatical.  I was,

9    as I noted, attending for the Department of general

10   surgery when I retired in 2003.

11             Obviously, I'm not employed there.  And I

12   have no relationship at this time with the University.

13   Q.        What -- what memberships -- you're a member

14   of what, if any, memberships?

15   A.            Well, I -- I am a member right now of the

16   Society for law, ethics, and medicine.  That's my only

17   active membership at this time.

18   Q.        Okay.  Do you remember --

19             MR. MIRANDA DALECCIO:  Excuse me.  I didn't

20   hear that -- sorry -- I did hear the last answer.

21             THE WITNESS:  My only active membership is

22   the Society for law, ethics, and medicine.

23             MR. SOLER MUÑIZ:  Okay.

24   BY MR. SOLER MUÑIZ:

24

1   Q.          And what have memberships been?  What other

2   memberships have you had if any before today?

3   A.          Well, I was a member of the American Board of

4   obstetricians and gynecology when I was board

5   certified.

6   Q.          What is that?

7   A.          That is an association of obstetricians and

8   gynecologists who have complied with the requirements

9   of the American Board of obstetrics and gynecology.

10  Q.          Okay.  Any  other memberships you might have?

11  A.          I was a member until 1997 of the American

12  College of obstetricians and gynecologists.  I was a

13  member of the American Society for post op and cervical

14  pathology.  I was a member of the American Laser

15  Society.  I was a member of the gynecologic laser

16  Society.  I was a member of the [Medical Association of

17  Puerto Rico], [Medical School of Puerto Rico], and

18  others I cannot remember right now.

19  Q.          Within the hospital, the oncologic hospital,

20  and the University, what have your administrative

21  positions been?

22  A.          Well, in 1985, I was the administrative chief

23  resident for the Department of obstetricians and

24  gynecology.  That's a liaison between the residents and

25  the attendings.

1          I was later on named director of gynecologic
2   oncology at the Department of obstetrics and
3   gynecology.  And then, I was named the director of
4   gynecology at the oncologic hospital.
5          Then, the one I said about presiding the
6   faculty, I was a member of the Board of directors of
7   the [Puerto Rican League against cancer] during the
8   time of -- I chaired the faculty staff.
9   Q.       Okay.  Have you been board certified in
10  obstetrics and gynecology at any point in time?
11  A.       Yeah.  I was certified in obstetrics and
12  gynecology since December 1987 until December 1997.
13  Q.       Okay.  And what does that mean to be board
14  certified in obstetrics and gynecology?
15  A.       Well, it puts you in -- in a special category
16  within the -- within the profession.  About 30% to 40%
17  of the obstetrics and gynecologists in the United
18  States are members of the board.
19         I was a member of the board for 10 years.
20  Q.       Okay.  And, after those 10 years, did you re
21  certify?
22  A.       I was supposed to recertify in 1997, but I
23  did not attend the recertification process.
24  Q.       Okay.  Any particular reason why you did not?

26

1   A.          Well, I had enough work and no time to study

2   for that.  So, I didn't go.

3   Q.          Were you required to be board certified to

4   practice obstetrics and gynecology?

5   A.          No.

6   Q.          What honors or recognitions have you had?

7   A.          Well, I -- I was asked to give the special

8   lecture in the [Medical Association of Puerto Rico] for

9   2 years.  I think --

10  Q.          In what?

11  A.          One was in biology, about the -- the -- the

12  affect of viruses in cancer.  And the other one was in

13  cancer in general.

14              I was also named attending of the year for

15  two times when I was attending at the University

16  Hospital.  I don't remember the years now.  They are

17  in my CV if you want to --

18              I was named faculty of the year at the

19  oncologic hospital.  And I was awarded the Isaac

20  González Martínez prize for contributions to the

21  [Puerto Rican League against cancer].

22              MR. SOLER MUÑIZ:  May we have the witness be

23  shown ID -- Plaintiff's ID No. 3, please?

24          (This is done)

1            MR. VIVAS:   If I may, may I see that

2    exhibit, please?

3            MR. SOLER MUÑIZ:   [Yes].

4        (This is done)

5        (Documents are reviewed)

6            THE WITNESS:   Okay.

7    BY MR. SOLER MUÑIZ:

8    Q.       Have you had the opportunity to look at the

9    document that was handed to you?

10   A.       Yes.

11   Q.       Sir?

12   A.       Yes.

13   Q.       And what is that document I'm showing you?

14   A.       It is a curriculum vitae of my --

15   Q.       Okay.

16   A.       -- my curriculum vitae updated to January of

17   2004.

18   Q.       Okay.  Do you have any other curriculum vitae

19   besides that one?

20   A.       Yeah.  I have one from October 2008.

21           MR. VIVAS:   We have an objection.

22           MR. MIRANDA DALECCIO:   Objection.

23           MR. VÁZQUEZ SANDOVAL:   Objection.

24           MR. VIVAS:   May I please the Court?

25           THE COURT:   Yes.

1           MR. VIVAS:   The curriculum vitae that was

2    provided to defendants under the Rule 26 of the Federal

3    Rules of Civil Procedure disclosures was the January

4    2004 curriculum vitae.

5           We were never -- never provided through the

6    deposition which was taken of Dr. Ramírez -- twice?

7           THE WITNESS:  No.  Once.

8           MR. VIVAS:   Or, during the deposition that

9    was taken to him.

10          THE COURT:  By whom?

11          MR. VIVAS:   By defendants.  That --

12          MR. SOLER MUÑIZ:  They never asked.

13          THE COURT:  Wait, wait, wait, wait.

14          A deposition by -- taken by defendant of his

15   own expert?

16          MR. VIVAS:   No, no, no.  Of Dr. Ramírez.

17          THE COURT:  Dr. Ramírez.  Oh, okay.

18          MR. VIVAS:   Yes.  Of Plaintiff's expert.

19   That October 2008 curriculum vitae was never produced.

20          It surprised the defendants.  And we object

21   any reference to any education, training, or experience

22   after January 2004, that was the disclosure under Rule

23   26 that was provided and never actualized to

24   defendants.

1          MR. MIRANDA DALECCIO:  May I add something
2    else, Your Honor, --
3          THE COURT:  Yeah.
4          MR. MIRANDA DALECCIO:  -- in defense of the
5    objection?
6          From February by this year you requested to
7    all parties to produce the curriculum vitae for your
8    review.  And the one that was produced is the one that
9    has Dr. Ramírez in the hand right now.  The one from
10   January -- October 2008 was not produced.
11         COURTROOM CLERK:  No.  He has 2008.
12         MR. SOLER MUÑIZ:  No. 2004.
13         MR. MIRANDA DALECCIO:  He has 2004.
14         COURTROOM CLERK:  Okay.
15         MR. MIRANDA DALECCIO:  And the Court
16   requested the curriculum vitae at the end of varieties
17   (sic) here, of all that's in this instance (sic).
18         MR. SOLER MUÑIZ:  I'm not -- I'm not moving
19   the curriculum vitae.  I'm just asking if he has
20   another curriculum vitae.  That's my question.  I
21   haven't moved to mark another curriculum vitae as an
22   ID.
23         THE COURT:  We are dealing with where the
24   Court will allow Dr. Ramírez to serve as an expert
25   witness in this case.  That I have to rule on that now.

1   And I don't think that it will interfere.  It may well

2   in all the knowledge, taking into consideration what

3   you just brought up.  But the Court for you has the

4   curriculum vitae from 2004 to 2008, to have both as, if

5   this gets to the circuit court, they'll have the

6   benefit of everything.

7           So, there's amply one from 2004 to 2008.  If

8   that exists?

9           MR. SOLER MUÑIZ:  There's one for 2008, Your

10  Honor.

11          THE COURT:  Alright.  Never fight with the

12  Court.

13          MR. SOLER MUÑIZ:  We never fight with the

14  Court.

15          THE COURT:  Alright.

16          MR. MIRANDA DALECCIO:  You mean, it's

17  produced to the parties, Your Honor.

18          THE COURT:  Yes.

19          MR. MIRANDA DALECCIO:  Alright.

20          COURTROOM CLERK:  As part -- 2004 will be

21  (a), and the one of 2008 will be (b).

22          MR. SOLER MUÑIZ:  Okay.

23          (Plaintiff Exh. No. 3 (a) and 3 (b)

24          are remarked for identification)

25          THE COURT:  Wait a minute.  Wait a minute.

31

1          (Documents are reviewed)

2               THE COURT:  Mr. Ramírez, proceed, please.

3               MR. SOLER MUÑIZ:  Yes.

4     BY MR. SOLER MUÑIZ:

5     Q.        Doctor, I'm showing -- another document has

6     been shown to you.  Could you please identify it?

7     A.        Yeah.  This is the updated curriculum vitae

8     which contains the same things as the 2004, in addition

9     to the things I've done in 2004 to October last year.

10    Q.        Okay.  Let's talk first about the things you

11    have done since 2004 to 2008.  Could you tell me what

12    are those?

13    A.        Okay.  Basically, what we have here is the

14    dates of when I quit my active practice, which is --

15    Q.        When was that?

16    A.        That was in 2003, August 2003.  That's the part

17    where it says professional experience, which is in

18    addition for the -- my curriculum vitae.

19              Then, I was in academic practice until 2005

20    at the center -- the cancer center in Manatí.  And I

21    became consultant and adviser to Immunologic Quality

22    Consultants, which is a company that --

23    Q.        What is that?

24    A.        It's a company that deals with certifying

25    physicians for practice in the Medicare advantage

1   Program, which is a company owned by my wife.  She's

2   the president and sole owner of the company.  And I

3   help her with the credentialing aspect, with the

4   lectures aspect to seminars to hospitals about the

5   health portability privacy Act, HIPA.

6   Q.       What is credentialing, Doctor?

7   A.       Basically, the Medicare advantage programs are

8   -- are directed at groups of Medicare patients that go

9   to health maintenance organizations like, for example,

10  [Auxilio Platino], and the federal government and the

11  health department require that the physicians who are

12  going to participate as providers be certified by a

13  company that has access to what is called private

14  source verification, which means that this company will

15  let us know the standing of this physician, if he has a

16  license to practice, where from is his license, where

17  he graduated from, what is his DEA number if he has

18  any, etc., how many lawsuits he has been involved, if

19  his license has been suspended or revoked in any states

20  of the -- any state of United States.

21          And, then, we offer -- and that is my job --

22  recommendations as to what to do with this particular

23  provider so that the company desires -- decides to hire

24  him or not.

25  Q.       Okay.

```
 1            THE COURT:  You are referring to your own
 2   curriculum vitae of that, Doctor?
 3            THE WITNESS:  I do an evaluation --
 4            THE COURT:  An evaluation?  Can you --
 5            THE WITNESS:  -- of the -- of the credentials
 6   of these doctors.
 7            THE COURT:  Can we call it, like, a
 8   curriculum vitae of the doctors, but includes other
 9   aspects like what you said, what -- has he been
10   disbarred or --
11            THE WITNESS:  Yeah.  What the --
12            THE COURT:  -- and other things, and then you
13   give an opinion?
14            THE WITNESS:  Yes.  I receive from the
15   company documentation about the history of these
16   physicians.  That you may call the curriculum vitae.
17            I evaluate it, and then I do a
18   recommendation.
19            MR. SOLER MUÑIZ:  Okay.
20            THE COURT:  Alright.  Wait a minute.
21       (Documents are reviewed)
22            THE COURT:  Your wife is a Doctor?
23            THE WITNESS:  No.
24            THE COURT:  Go ahead.
25            MR. SOLER MUÑIZ:  Okay.
```

34

1   BY MR. SOLER MUÑIZ:

2   Q.       Besides doing credentialing for that company,

3   have you done credentialing before, and for whom?

4   A.       Well, I did credentialing as part of my duties

5   when I was an attending and when I was the president of

6   the medical staff at the oncologic hospital.

7   Q.       When you were an attending where?

8   A.       At the University of Puerto Rico.

9        THE COURT:  By credentialing, you mean

10  evaluation?

11       THE WITNESS:  Yeah.

12       MR. SOLER MUÑIZ:  Yes.

13       THE COURT:  Alright.  For the lasting terms,

14  you use the evaluation.

15       MR. SOLER MUÑIZ:  Okay.

16  BY MR. SOLER MUÑIZ:

17  Q.       In -- in terms of -- what difference if any is

18  there in the credentialing you do at Innovative Quality

19  Consultants compared to the credentialing that you did

20  at the University?

21  A.       Well, here, what I do is do a recommendation.

22  When  I worked at the University, I had to study the

23  credentials of the individual to see if he was

24  qualified to practice in my hospital.  And then, I was

25  part of the qualification process.

35

1              Here, I only do a recommendation.

2    Q.      And there?

3    A.      I had -- I had to participate, and I was liable

4    during the credentialing process, because I was

5    receiving a new attending, for example.

6              THE COURT:  You took the position there, here

7    he had come in?

8              THE WITNESS:  Yes.  Basically, that's

9    something -- thank you.

10             THE COURT:  Go ahead.

11             MR. SOLER MUÑIZ:  Okay.

12   BY MR. SOLER MUÑIZ:

13   Q.      Any other difference between the 2004 and 2008

14   --

15   A.      Well, the --

16   Q.      -- curriculum vitaes?

17   A.      -- the other addition is that about the

18   lectures and research.  I am doing health law and IPA,

19   medical malpractice, AMTALA, some through your company

20   as a lecturer for -- for [seminario jurídico].

21             THE COURT:  You'll be doing that after 2004?

22             THE WITNESS:  Yeah.  That's when it began.

23             We did some lectures beforehand, because the

24   AMTALA law has been around since 1986.  Obviously, we

25   had to -- to give lectures about that to when I was --

1          THE COURT:  About the AMTALA?

2          THE WITNESS:  About the AMTALA.  When I was -

3  - when I was a physician, because we had to teach the

4  residents what AMTALA meant and what were their

5  responsibilities under law.

6          Because, we had an emergency room, and I -- I

7  was an attending at the emergency room for -- for

8  months at -- all of the time I would say I was at the

9  Medical Center and.

10         But, now, it's more from the teaching

11 perspective and not only through the practice

12 perspective.

13         MR. SOLER MUÑIZ:  Okay.

14 BY MR. SOLER MUÑIZ:

15 Q.     At the University, what would you teach the

16 residents about AMTALA?

17 A.     Well, about the responsibilities under the law

18 of attending patients when they went into the emergency

19 room, about how --

20         THE COURT:  But is he doing that now?

21         MR. SOLER MUÑIZ:  No.

22         THE COURT:  At the University.  He's not

23 teaching there?

24         THE WITNESS:  No.  No.

1          THE COURT:  So, we're not dealing -- I

2    thought we were dealing from 19 -- from 2004 to 2008,

3    no?  We're getting to that?

4          MR. SOLER MUÑIZ:  No.  I was just asking what

5    differences if any other were between the 2004

6    curriculum vitae and the 2008 curriculum vitae.  That

7    was the question.

8          THE COURT:  Well, I'm a little bit confused,

9    but go ahead.

10          MR. SOLER MUÑIZ:  Okay.

11    BY MR. SOLER MUÑIZ:

12    Q.     Let's -- let's -- let's go back and deal with

13    this in order -- okay?  Let's take the curriculum vitae

14    -- okay?  -- let's take the 2008 curriculum vitae and

15    go step by step --

16    A.     Okay.

17    Q.     -- okay?

18          So, you have already stated what University

19    you did your degree.  That was the University of Puerto

20    Rico, your bachelor's degree in science.

21    A.     Yes.

22    Q.     You have stated that you did medicals too at

23    the University of Puerto Rico, graduating when?

24    A.     1981.

38

1  Q.        Okay.   Then, your internship, what was your

2  internship?

3  A.        In 1981 to 1982.

4  Q.        And in what?

5  A.        In obstetrics and gynecology.

6  Q.        Okay.   And, then, your residency, where was

7  that?

8           MR. VIVAS:   Objection, Your Honor.   Asked

9  and answered.  He's just repeating everything that has

10 been testified.

11          THE COURT:   No, no, no, no.

12          Go ahead.

13          MR. SOLER MUÑIZ:   Okay.

14 BY MR. SOLER MUÑIZ:

15 Q.        Then, yes, residency?

16 A.        My residency was in obstetrics and gynecology,

17 and that was in 1982 to June 1985.

18 Q.        Okay.   Continue through the curriculum vitae,

19 please.

20 A.        Well, I had, what I said, the special

21 qualification pelvic surgery.   Then, I did a special

22 qualification in operative laparoscopy.

23 Q.        What is that?

24 A.        Well, that's doing surgery through an

25 instrument, that they use what they call a minimally

1   invasive surgery.  It's, like, a rod with light and

2   vision, and you put it inside the abdomen -- in my case

3   -- inside the abdomen.  And, then, through other

4   entrances, you pass instruments, and you can do

5   ovarectomies which is removal of the ovaries; you can

6   do sterilizations'; you can take out a uterus or do a

7   hysterectomy.

8              I published, which is in my curriculum vitae,

9   the first 11 radical hysterectomies done through the

10  laparoscope, and that was basically a study we -- we

11  did as part of our research.  It's not standard

12  practice.  But it was done.

13             And that's the purpose of operative

14  laparoscopy.

15  Q.      Okay.  Then, board certification?

16  A.      Yeah.  I had the second part of the board

17  approved in 1987.  And, as I said, I was due to

18  recertify in 97, and I didn't.

19  Q.      Okay.  Continue.

20  A.      Well, I was an academic -- it goes into

21  academic positions, and this is -- I was appointed

22  instructor in obstetrics and gynecology at the

23  University of Puerto Rico, and was -- I was promoted to

24  assistant professor of obstetrics and gynecology in

25  1988.

1          Then, I became assistant professor of

2     obstetrics and gynecology, but with the general surgery

3     department.  The board, the surgery board required that

4     the surgery department have an in-house gynecologist in

5     order to be approved by the Board of general surgery,

6     and they asked me to do that.  And I was -- I then

7     transferred from obstetrics and gynecology to the

8     Department of surgery.

9          As I said before, my professional experience:

10    I quit private practice in 2003.  I quit academic

11    practice in 2006.  And then I became an adviser and

12    consultant to Innovative Quality Consultants.

13         And all the lectures we spoke about, the

14    memberships, I said I was a fellow of the American

15    College.  I was a fellow of the American Society of

16    post op and cervical pathology, a fellow of the

17    gynecological laser society, a fellow of the American

18    Association of gynecological laparoscopy, a member of

19    the College of physicians and surgeons, a member of the

20    Puerto Rico Medical Association, and now I am working

21    with the American Society of law, medicine, and ethics

22    since last -- since the two years ago.

23         My administrative positions were

24    administrative chief resident for ob/gyn at the

25    University hospital.  I was a director of the division

41

1    of gynecological oncology at the University of Puerto

2    Rico.  I was the director of the department of

3    gynecology at the oncologic hospital in Centro Médico.

4    I was director of the division of gynecologic oncology

5    at the San Juan City hospital since 1995 to 1998.  I

6    was a director of the Division of gynecologic oncology

7    at the Caguas regional hospital.  I was president of

8    the medical staff at the oncologic hospital on 1993 to

9    1997.  I was elected as a vice president of the student

10   council of the National Sciences and faculty at the

11   Recinto de Río Piedras in 1975.  Then, I became

12   president of the student council of the natural Science

13   faculty in 1976.

14           I was a member at large of the general

15   student council of the University of Puerto Rico in Río

16   Piedras in 1977.  I was a member at large of the

17   executive committee of the oncologic hospital in 1992-

18   '93.  And, then, I became president of the staff in

19   1993 and in 1997.

20           I go into my medical experience.  I was

21   attending, supervising interns and residents in

22   surgery, emergency room, labor room, and outpatient

23   clinics at the University Hospital per se since 1985 to

24   1994.

1          I was attending, supervising  interns and
2    residents in surgery, the emergency room, the labor
3    room, and outpatient clinics at the oncologic hospital
4    in 19 --
5    Q.      Please talk a little bit slower.
6    A.      Oh, sorry.
7              THE COURT:  Well, yes.  He can.  You say that
8    he --
9              MR. SOLER MUÑIZ:  Yes.  I -- I just want him
10   to be slower so Your Honor could understand.
11             THE COURT:  No, no.  I quit writing.  We have
12   it there.
13             MR. SOLER MUÑIZ:  Okay.
14             THE COURT:  It's impossible for me to take
15   those notes.
16             MR. SOLER MUÑIZ:  Okay.
17   BY MR. SOLER MUÑIZ:
18   Q.      Go ahead.
19   A.      Okay.  I was attending at the -- at the
20   oncological Hospital since 1985 to 2003.  I was
21   attending, supervising interns and residents in
22   surgery, emergency room, the labor room, and outpatient
23   clinic at the San Juan City hospital since 2005.
24             Active faculty at University Hospital, 1985
25   to 1994.  I was active faculty at the oncologic

43

1    hospital of the dates I stated before.  I was active

2    faculty at teachers hospital in 1985 until -- until

3    1989.  And I was active faculty at Pavia hospital in

4    1989 to 1993.  I was active faculty at Doctors Center

5    Hospital in Manatí, and consultant to the cancer center

6    in 1994 to present.

7              I am active faculty at the San Juan City

8    hospital in 1995 to 2004.  Emergency room moonlighting

9    with [Administration of medical services], 1982 until

10   1985 when I --

11   Q.      What was that about the emergency room

12   moonlighting?

13   A.      Well, that -- you do the night shift.  And,

14   because of the contract the ASEM had with the

15   University, they paid you $8 an hour, I think, for --

16   for doing the duties until 4:00 p.m. until 7:00 a.m.

17   the next day.

18   Q.      On what?

19   A.      On that --

20           THE COURT:  Moonlighting does not mean

21   anything else (sic).

22           MR. SOLER MUÑIZ:  Okay.

23           THE WITNESS:  And -- and --

24           THE COURT:  In this case.

25           MR. SOLER MUÑIZ:  Okay.

1    BY MR. SOLER MUÑIZ:

2    Q.        And on -- on what did you practice here?

3    A.        The ASEM emergency room at.

4    Q.        Okay.  And what did you do there?

5    A.        Well, I saw patients that came in.

6    Q.        Any kind of patient?

7    A.        Any kind of patients.  Mostly women.

8    Obviously, I was assigned to the area where they did

9    gynecology, but we also saw gunshot wounds, knife

10   fights, --

11              INTERPRETER/TRANSLATOR:  "Stabs".

12              THE WITNESS:  -- stab wounds -- Yeah, thank

13   you.

14              MR. SOLER MUÑIZ:  Okay.

15   BY MR. SOLER MUÑIZ:

16   Q.        Will you go into your honors and recognitions?

17   A.        Well, the graduating residents of the

18   department honored me in 1993 as the attending of the

19   year.  I received the Enrique Oliveras Guerra medal.

20   That is a medal that they give at the oncologic

21   hospital for special services.

22              Of the graduating residents of the Department

23   of obstetrics and gynecology, again, honored me in 1994

24   as attending of the year, and I received the Isar

25   González Martínez medal.  Isar González Martínez is the

1  founder of the [Puerto Rican League against cancer],

2  and the hospitals name is Isar González Martínez.  In

3  '95.

4          And I gave the lectures, I said before, at

5  the Puerto Rico Medical Association in 1994 and 1998.

6          I was --

7  Q.      Yes.  Excuse me.  What committee memberships

8  have you had?  And when I say committee, what is

9  committee?

10 A.      Well, a committee is a group of people who are

11 asked to do a specific task or not.  And they are

12 appointed by the ruler of whatever place the committee

13 is.  In the hospital setting, it is by the President

14 of the medical staff.  He is the one who appoints the

15 committees.

16 Q.      Okay.  What memberships have you had in

17 committees?

18 A.      Well, I was a member of the tissue committee at

19 the University Hospital for four years.  I was a member

20 of the tissue committee also at the oncologic hospital

21 for the same amount of time.

22          I was chairman of the laser safety and

23 research committee at the University Hospital in 1992

24 to 1994.  And I was chairman of the laser committee at

25 the Isar González Martínez hospital.

1          And I said before -- it's not in this portion

2    of the curriculum vitae -- that I was chairman of the

3    executive committee of the oncologic hospital since

4    1993 to 1997 or eight -- I can't remember.

5    Q.        Okay.  Within your courses and seminars, you

6    mentioned you have given seminars in AMTALA.  Could you

7    tell us what seminars in AMTALA you have given?

8    A.        No, we -- we gave a lecture in one of your

9    seminars that covered a portion of AMTALA in the Puerto

10   Rico Bar Association.  It was three years ago from what

11   I believe, what I remember.  And then, we gave one two

12   years ago that was a specific lectures about AMTALA to

13   a group of lawyers and doctors for the purpose of

14   giving education credits.

15   Q.        Do you remember what within AMTALA did you

16   cover in those seminars?

17   A.        Well, I covered basically what are the minimal

18   requirements of a hospital for an emergency room, about

19   the criteria I have to meet to comply with the

20   emergencies and medical treatment Labor Act.  We talk

21   about spinning (sic), about what patients you have to

22   see, what -- what you have to do with them, the medical

23   screening examination, the concept of stabilization, a

24   treatment, and of transfer or discharge.  If it's a

25   patient or an obstetric patient.

1          And that's basically what we covered on

2     those.

3     Q.      And where did you get this information or

4     knowledge about AMTALA?

5     A.      Well, we do continuing medical education on

6     AMTALA.  I am -- I studied about the subject for --

7     during my career.  It was a subject matter that was of

8     high interest to me, because, at that time, when I was

9     a resident, they dumped patients on us the private

10    hospitals.  So, we were very happy when Congress

11    finally passed the Omnibus reconciliation Act of 19 --

12    or the cover act (sic) in 1986, that then prohibited

13    hospitals from dumping patients to public hospitals

14    which is the University Hospital.

15    Q.      What is patient dumping?

16    A.      Patient dumping is that, for example, -- I'm

17    going to give you an example -- a patient that has no

18    medical insurance, they just "You have no medical

19    insurance.  I'm not going to see you here even if you

20    have an emergency medical condition.  I am going to

21    transfer you to a public hospital".

22          And we received at the University Hospital --

23    and we still receive when I left -- patients that would

24    -- you could call dumping.

1  Q.       Okay.  When did you first become acquainted

2  with AMTALA?

3  A.       More or less when the time -- at the time when

4  Congress passed the law, in 1986-87.

5  Q.       How do you keep abreast of AMTALA?

6  A.       Well, I read the articles that come out through

7  the different internet sites, like Medlaw, the CMS

8  publications.

9  Q.       What is CMS?

10  A.       The -- I'll call it the organizational arm of

11  the Health and Human Services Department.

12  Q.       Okay.

13  A.       Centers -- Centers for Medicare services.

14  Q.       Okay.

15  A.       And they publish guidelines for -- for AMTALA,

16  among other things.

17  Q.       And what do those guidelines about AMTALA

18  include or say?

19  A.       Well, they basically -- the guidelines would

20  cover what -- what happens with a patient that is in an

21  ambulance, or what happens with a patient -- with a

22  labor room patient, or a labor -- or a patient that --

23  a woman that's pregnant.

24         For example, the latest stated was about two

25  years ago.  A pregnant woman could not be discharged

1    from hospital, only by a doctor.  Now, a midwife can do

2    that, according to the AMTALA regulations.

3    Q.      Okay.  About the seminars that you gave to the

4    group of doctors and lawyers, do you know if that

5    seminar was accredited or not?

6    A.      Yes.

7    Q.      By whom?

8    A.      It was approved by the Puerto Rico Bar

9    Association.

10   Q.      Do you know how many credits?

11   A.      I think eight credits.  It was an eight hour

12   seminar.

13   Q.      Do you know any other entity that accredited

14   that seminar, those seminars?

15   A.      Not that I remember.

16   Q.      Okay.  In terms of your publications, Doctor,

17   what -- what have been your publications?

18   A.      Well, I list my publications here.  Those in a

19   peer review journals.  I did one in obstetrics and

20   gynecology in 1987.  I published one -- this was about

21   uterine cancer -- I published one in 1993 about

22   laparoscopic radical hysterectomies.

23          I published another one which was a follow-up

24   of the previous one in 1994 about the role of operative

25   laparoscopy in gynecologic oncology.

50

1    Q.       Okay.  And what about research, Doctor?

2    A.        Well, we -- as part of my -- my participation

3    with the University, we had a grant with the National

4    Institute of Health on -- on two subcommittees which

5    one was the gynecologic oncology group, and we

6    participated in studies with the gynecologic oncology

7    group.  And I also participated on studies with the

8    radiotherapy oncology group.

9            In that group, I was chairman of the

10   subcommittee on uterine cancer.

11   Q.       Okay.  Any other abstracts or presentations

12   that you may have had?

13   A.        Well, they are listed here in the -- in the --

14   I don't know if you want me to go through them.

15   Q.       Briefly.

16   A.        Huh?

17   Q.       Briefly.

18   A.        Well, basically, they were obviously

19   presentations at the meetings of the American College

20   of obstetricians and gynecologists district meetings.

21   There was one in the general meeting in Boston.

22            We did presentations also at the American

23   Society for post op and cervical pathology.  The

24   gynecologic laser society we also presented a paper

25   about laser surgery for vulva carcinoma.

1   Q.        Okay.  In terms of your knowledge of obstetrics

2   and gynecology since you last practiced obstetrics and

3   gynecology in private practice up to today, how that --

4   how that has come?

5   A.        Well, I -- I do my CME credits.  Every week, I

6   do one credit to the National Institute of Health or --

7   or E-medicine.

8   Q.        What is the National Institute of Health?

9   A.        That's a government -- a government sponsored

10  through the Health and Human Services Department

11  organization that has -- between the things that they

12  have to do is provide education and -- to physicians

13  and students of medicine.

14  Q.        Okay.  Do you know if the National institutes

15  of Health is a federal or a state entity?

16  A.        No.  It's a federal organization.

17  Q.        Okay.  And what about e-medicine?

18  A.        E-medicine is a subcommittee of Medscape, which

19  is part of the National Institute of Health.  What they

20  do is that they publish articles on -- on specific --

21  review articles on specific diagnoses in order that you

22  read them, you take a test, and they give you a credit.

23  Q.        Okay.  How do you get those materials from the

24  National Institute of Health and e-medicine?

25  A.        Through the Internet.

1  Q.       Okay.  You have said that you have been an

2  expert in cases before?

3  A.       Yes.

4  Q.       I ask you: in how many cases have you

5  participated if you have an idea?

6  A.       Well, I participated --

7             THE COURT:  Expert.  As an expert?

8             MR. SOLER MUÑIZ:  As an expert.

9             THE WITNESS:  As an expert, in reviewing

10  records, in many, many cases.  More than hundreds I

11  would say.

12            THE COURT:  Wait a minute.  Reviewing --

13  reviewing the records?

14            THE WITNESS:  The records.  They -- the

15  attorneys call me, "I have this record I want you to

16  review".

17            I look at the record, and I gave them a

18  preliminary opinion on what I think happened or did not

19  happen.

20            If I've written about 150 expert reports, I

21  don't take every case I get.

22  BY MR. SOLER MUÑIZ:

23  Q.       How come?

24  A.       Well, some cases will come to me because of

25  maloccurrence, and I don't take them or -- or -- or I

53

1   do a verbal discussion with the lawyer, if it's -- if

2   he's a defendant.  And, then, we part from there if

3   it's necessary that I intervene.

4              I would say I take about three out of 10

5   cases only.

6   Q.      Okay.  You talk about you don't take cases in

7   which a mal occurrence occurred.

8   A.      Yes.

9   Q.      What is a mal occurrence?

10  A.      Well, that something wrong, not -- something

11  bad happens, not something wrong.  And there is a

12  difference between -- not -- medicine is not perfect.

13  And that we had a bad outcome doesn't mean that there

14  was negligence or malpractice.

15  Q.      Okay.  In terms of those cases that you have

16  reviewed, do you have an idea how many have been for

17  the proposed Plaintiff and how many for the proposed

18  Defendant?

19  A.      Well, at the beginning, it was about half and

20  half.  But, then, as I started doing work for the

21  plaintiffs, they started to -- to not consulting me

22  Defendant cases.

23             And I would say, in the last year, I haven't

24  been consulted for a defendant's case.

25  Q.      I'm sorry?

1    A.        In the last year, I haven't been consulted for

2    a defendant's case.

3              THE COURT:   So, you've been doing it for the

4    Plaintiff in the last year?

5              THE WITNESS:   In the last year.  Yes, sir.

6    BY MR. SOLER MUÑIZ:

7    Q.        Was it because of your choice, or was it

8    because of chance?

9    A.        Well, it happened, you know.  Once you go

10   against the establishment, the physicians, and you --

11   you are -- you are personae non grata within the club,

12   so they stopped giving me cases.

13   Q.        In those cases that have reviewed, in how many

14   have you provided expert written opinions?

15   A.        Well, in about 150 cases in the last 10 years.

16   Q.        Okay.  And, of what you know, how many of those

17   cases have gone into becoming lawsuits, civil cases?

18   A.        All of them.

19   Q.        Okay.

20             THE COURT:   All of them?

21             THE WITNESS:   Yeah.

22             THE COURT:   All ended up in court?

23             THE WITNESS:   Yeah.  Usually, when I get a

24   case, it's because already there is a cause for action.

25   It will go into court.  Maybe one or two didn't go for

1    other reasons, but I would say all 150 in the last 10

2    years did go.

3              MR. SOLER MUÑIZ:   Okay.

4    BY MR. SOLER MUÑIZ:

5    Q.        You have been deposed in cases?

6    A.        Yes.

7    Q.        How many times would you say?

8              THE COURT:   Deposed?

9              MR. SOLER MUÑIZ:   Deposed.

10             THE WITNESS:   It would cover about 50, just -

11   - just to make a ball park figure.

12   BY MR. SOLER MUÑIZ:

13   Q.        And you have testified in trial as an expert

14   witness in medical malpractice cases?

15   A.        Yes.

16             THE COURT:   Testified in court?

17             MR. SOLER MUÑIZ:   In Court.

18             THE WITNESS:   Yes.

19             THE COURT:   How many?   50?

20             MR. SOLER MUÑIZ:   In trial.

21   BY MR. SOLER MUÑIZ:

22   Q.        In -- in how many occasions have you testified

23   in court as an expert?

24   A.        Including this one if I testify, it will be 12.

25   Q.        Okay.

1           THE COURT:  12?

2           THE WITNESS:  Yes.

3           THE COURT:  Most of them being settled?

4           THE WITNESS:  Most of them are settled, yes.

5    Thankfully.

6    BY MR. SOLER MUÑIZ:

7    Q.      How many of those have been in state court, and

8    how many have been in federal court?

9    A.      I appeared in federal court twice.  Once was a

10   case in default.

11          THE COURT:  So, that's in the trial?

12          THE WITNESS:  In -- in trial, Yeah.

13          THE COURT:  But he's asking generally.  How

14   many have you been consulted in trial court cases?

15          THE WITNESS:  Oh, sorry.  I'm sorry.  I

16   misunderstood the question.

17          THE COURT:  Do you know?

18          THE WITNESS:  Well, I would say about 25

19   percent of the cases I am consulted are federal cases,

20   that I do -- that I do an opinion --

21          MR. SOLER MUÑIZ:  Okay.

22          THE WITNESS:  -- would be federal cases.

23   BY MR. SOLER MUÑIZ:

1  Q.       And of the ones that actually get to trial, in

2  how many of those that you have testified as an expert

3  in trial are federal cases?

4  A.       I did one in Judge Domínguez's Court some years

5  ago, but it was in default.  It was not a trial.  It

6  was a hearing in default.

7  Q.       Okay.  And what -- what did that case entail?

8  A.       That case was about gynecologic surgery where

9  the physician who operated on the patient did not have

10 permission from the patient to -- for him to operate on

11 her.

12         He did a surgery in 20 minutes.  He

13 transected, he left urethra, did not recognize it.  The

14 patient lost her kidney afterwards.

15         And, because of that case, the federal court

16 ordered the [Medical examining board court] to disbar

17 this physician.

18 Q.       What was the name of the physician?

19 A.       Pérez Toledo.

20 Q.       And in what year did you testify in that case?

21 A.       I think it was 2002 or 2001.  I don't remember.

22 Q.       Any other case --

23 A.       In federal court?

24 Q.       -- in federal court as an expert?

1  A.       Well, we went for an AMTALA hearing, but it

2  didn't -- it didn't happen.  So, I went to Magistrate

3  Arenas's courtroom, but the hearing didn't happen.  It

4  was about AMTALA.

5  Q.       What -- what do you know about --

6              THE COURT:  You did not -- you did not

7  testify?

8              THE WITNESS:  No.  We did not get to do the

9  hearing.

10  BY MR. SOLER MUÑIZ:

11  Q.       What if you know what was the result of that

12  case?

13  A.       Well, that was a patient --

14  Q.       No.  The result.

15  A.       The result was a settlement.

16              THE COURT:  A settlement?

17              THE WITNESS:  Yes.

18  BY MR. SOLER MUÑIZ:

19  Q.       Any other expert testimony in federal court?

20  A.       No.

21  Q.       Have you ever been disqualified in federal

22  court as an expert in obstetrics and gynecology?

23  A.       No.

24  Q.       Now, state court?

25  A.       Yes?

1   Q.        In how many state court -- and I'm -- I'm

2   assuming the Commonwealth of Puerto Rico --

3   A.        Yes.

4   Q.        Have you testified abroad?

5   A.        No.

6   Q.        Or been an expert abroad?

7   A.        Not that I know of.

8           THE COURT:  He never testified in court, in

9   the state court?

10          MR. SOLER MUÑIZ:  In -- yes.  No, I'm -- I'm

11  asking if he has testified or been an expert outside of

12  Puerto Rico.

13          THE COURT:  Oh.

14          MR. SOLER MUÑIZ:  Okay.

15  BY MR. SOLER MUÑIZ:

16  Q.        Now, let's go to state court in Puerto Rico.

17  A.        Yes?

18  Q.        In how many cases have you testified as an

19  expert witness in state court in Puerto Rico?

20  A.        I'd say in about 10.

21  Q.        And that is in trial?

22  A.        In trial.

23  Q.        Okay.  How many times have you been

24  disqualified as an expert in obstetrics and gynecology

25  in state court in Puerto Rico?

1    A.        Never.

2    Q.        How many times have you been qualified as an

3    expert in obstetrics and gynecology in a state court

4    case in Puerto Rico?

5                    THE COURT:   10 cases.

6                    MR. SOLER MUÑIZ:   Okay.

7                    THE COURT:   How many, that's what he said.

8                    THE WITNESS:   But not all the cases were

9    obstetrics and gynecology, Your Honor.

10                   THE COURT:   Oh.

11                   THE WITNESS:   Okay?

12                   MR. SOLER MUÑIZ:   Okay.

13                   THE WITNESS:   Some were emergency medicine.

14   I would say in about eight.  The majority of them were

15   in obstetrics and gynecology, but there were a couple

16   that were not.

17                   THE COURT:   You testified as to other forms

18   of the medicine?

19                   THE WITNESS:   Yes.

20                   MR. SOLER MUÑIZ:   Okay.

21                   THE COURT:   Wait a minute.

22       (Documents are reviewed)

23                   THE COURT:   Alright.  I'm going to call the

24   jury to let them go for lunch.

25                   COURTROOM MARSHAL:   Okay.

1          THE COURT:  Please call the jury.

2          COURTROOM MARSHAL:  Okay.

3      (Jury is called)

4          THE COURT:  You may sit down.  You are

5   supposed to come back at 3:00.  It's already --

6          COURTROOM CLERK:  That they didn't know it.

7          THE COURT:  Huh?

8          COURTROOM CLERK:  They didn't know.

9          MR. VIVAS:   They didn't know it.

10          THE COURT:  The what?

11          MR. VIVAS:   They did not know that the

12   schedule that we were -- we had planned for today.

13          THE COURT:  Well, one of them requested that.

14

15          MR. ORTIZ VÉLEZ:  No.  It was Mr. Soler, Your

16   Honor.

17          MR. MIRANDA DALECCIO:  It was discussed among

18   the attorneys and Your Honor.

19          THE COURT:  No, no.  I told him that, yes, I

20   was going to let them go until 3:00.  I'm not that

21   crazy.

22          So, it's late already.  So, be back here at

23   10 after 3:00.  Thank you.  You may leave now.

24          COURTROOM MARSHAL:  All rise.

25      (Jury is excused)

62

1          THE COURT:  Okay.  Let's keep on going.

2          COURTROOM CLERK:  You may be seated.

3   BY MR. SOLER MUÑIZ:

4   Q.      Doctor, we were talking about these Puerto Rico

5   state cases that you have testified as an expert in

6   trial.

7   A.      Yeah.

8   Q.      I ask you: besides in obstetrics and

9   gynecology, in those cases, in what other areas of

10  medicine have you testified as an expert?

11  A.      One was the implantation of a ballooning device

12  in a --

13  Q.      Of a?

14  A.      A ballooning device to expand skin.  And the

15  other was about emergency medicine at.

16  Q.      Okay.  And how many times have you been

17  qualified as an expert in emergency medicine in trial

18  in state court of Puerto Rico cases?

19  A.      That one.

20  Q.      Have you ever been disqualified by any court as

21  an expert in emergency medicine?

22  A.      No.

23  Q.      Or as an expert in AMTALA?

24  A.      No.

25  Q.      Or as an expert in ob/gyn?

63

1    A.        No.

2    Q.        What is the current status of your license as a

3    Doctor?

4    A.        Well, I have a license in Puerto Rico to

5    practice medicine, and it's not -- it's 7532.  And --

6    Q.        What's that again?

7    A.        7532.

8    Q.        Okay.

9    A.        And it's inactive, because I'm retired.

10   Q.        Could you please explain?

11   A.        Well, basically, the categories of your

12   license, there's an active license to practice

13   medicine, a retired license if you are retired, a

14   suspended license if you are suspended, or a refusal of

15   a license because you become disbarred.

16             I retired -- I decided to retire from the

17   active practice of medicine in 2004.  And I notified

18   the [Medical examining board], and they asked me if I

19   wanted to inactivate my license, and I said yes.

20             So, I did an affidavit that they required,

21   and I signed it, and I took it to them.

22   Q.        And if you want to come back to practice?

23   A.        Well, I go to the TEM, and I -- the paper, the

24   same paper that I signed says that I didn't lose my

25   license.  I still have the same number.  I have to go

1    to, now, the [Junta de Disciplinas Médicas] and ask

2    them what I have to do to comply with the requirements

3    to have my license active.

4              Once I have my license active, I can do -- go

5    and take a malpractice insurance.  I can, if I want to

6    take the Puerto Rico state license for narcotics and

7    the DEA license for narcotics and start practicing.

8              THE COURT:  How -- before they give you your

9    change from inactive to active, --

10             THE WITNESS:  Yes?

11             THE COURT:  -- Do you have to take certain

12   studies and courses required?

13             THE WITNESS:  Well, while you're active, you

14   have to comply with 20 hours of continuing medical

15   education credits.  That's what they ask for

16   recertifying you.

17             THE COURT:  20 hours of what?

18             THE WITNESS:  20 hours of continuing medical

19   education credits for -- for a period of three years,

20   it's 60 credits.

21             I do one CMA credit a week, which is about

22   150 credits.  So, I would -- in that sense, I would

23   comply with their requirements.

24             THE COURT:  Whatever it is you have to take?

1          THE WITNESS:  I don't have to, but I -- I

2   like it.  I enjoy it.

3          THE COURT:  I know.  For -- for them to

4   review your license, you don't have to do anything I

5   suppose, because you are already doing it now?

6          THE WITNESS:  Yes, sir.

7          THE COURT:  Alright.

8       (Documents are reviewed)

9          THE COURT:  You already are doing it now in

10  the work you have?

11         THE WITNESS:  I don't have to do it for the

12  work, but I like doing it, certifying my CMA, so, if

13  anything happens and I want to go back, I want to be

14  ready and have it.

15         THE COURT:  Okay.  Go ahead.

16         MR. SOLER MUÑIZ:  Okay.

17  BY MR. SOLER MUÑIZ:

18  Q.       In terms of the courses or the credits that you

19  have taken with your continuous medical education, in

20  what topics has that been?

21  A.       Well, I would say half of them are in cancer

22  and obstetrics and gynecology.  I also do pediatrics,

23  for example, immunization, HIV treatment, surgery for -

24  - plastic surgery for reconstructive surgery, different

25  things.  Epidemiology, laboratory testing, radiology.

1  Q.        Okay.   And within those that you have done in

2  obstetrics and gynecology specifically, what -- what

3  topics has that touched?

4  A.        Well, they go through ultrasonography for --

5  for pregnant women, the immunization requirements for

6  pregnant women, the HIV testing of pregnant women, the

7  fetal monitoring, intrapartal fetal monitoring, the

8  measure of different hormones during pregnancy.

9            Gynecology would include new techniques on

10  doing surgeries for example, new techniques of treating

11  X-ray and replacement therapy, which has been changing

12  in the last years.  Those things.

13  Q.        Okay.  How has the practice of medicine

14  regarding of the standards of practice in this case, in

15  Hazel's case, changed from the last time you practiced

16  in obstetrics and gynecology to today?

17  A.        Nothing.  It's the same.  Since I became --

18  since I was a student, the diagnosis of preterm labor

19  is the same as today.  The treatment of preterm labor

20  is basically the same.

21            It's a condition that, maybe 30 years ago,

22  you could -- you wanted to stop, for example, -- I'll

23  give you an example of treatment.  Before, you wanted

24  to stop the baby from coming out at 27 weeks.  But,

25  now, with the new technologies and the new things that

67

1    they have for the newborn, a 27 week-old baby has a

2    survival rate of almost 100 percent within the

3    specialized units.

4            So, stopping labor is no longer a priority

5    within the continental United States.  Puerto Rico

6    would be an exception because of the quality of the

7    neonatal care units here, and the resources has been

8    published in the press, etc., etc..

9            But there is no new research just to say that

10   has changed the standard of practice for the diagnosis

11   management of preterm labor.

12   Q.      Okay.  You mentioned preterm labor.

13   A.      Yeah.

14   Q.      And, without getting into the specifics, what -

15   - what other areas of medicine does this case touch?

16   A.      Well, it touches the emergency room care --

17   okay? -- the preterm labor and the management of the

18   preterm labor.

19   Q.      And how has that changed since the last time

20   you practiced medicine until today?

21   A.      No.  It's the same.

22   Q.      What other areas of medicine does that -- does

23   this case entail?

24   A.      I don't understand the question.

25   Q.      Okay.  I'm sorry.  Strike that.

1          What other topics or -- within obstetrics and

2   gynecology will be discussed in this case?

3   A.       Well, there is a controversy about the cervix,

4   a contracting cervix for example --

5   Q.       Okay.  And --

6   A.       -- that will be -- yes?

7   Q.       -- and how has the knowledge, diagnosis,

8   treatment or else incompetent service changed from the

9   last time you practiced medicine until today?

10  A.       Well, the standards of a competent service, the

11  standard of practice in competent service have not

12  changed.  What has changed is the -- and many studies

13  have come out about what procedures you can do to

14  prevent -- not prevent it, but diagnosed it thoroughly,

15  like, sonography, etc..

16          That's a -- that has come through the last 10

17  or 15 years.

18  Q.       Okay.  Is your expert opinion in this case

19  formed around the standards of practice in obstetrics

20  and gynecology?

21  A.       Of course.

22  Q.       And those standards that you used to form your

23  opinion are valid as of what date?

1   A.        As  for  the  date  that  the  events  happened

2   obviously.  And  they  have  been  the  same  for  the  last

3   years.

4   Q.        How  many  years?

5   A.        Since  I  was  a  resident.

6   Q.        And  --  and  what  about  AMTALA?

7   A.        Well,  about  the  AMTALA,  it's  --  the

8   requirements  are  the  same.  For  a  pregnant  patient,  the

9   only  thing  that  changes  recently  about  the  guidelines

10  was  that  a  midwife  could  certify  that  a  pregnant  woman

11  was  not  in  labor  before  discharging  her.

12        And  that's  the  only  thing  I  can  tell  you

13  about  AMTALA  and  how  it  has  changed.  Everything  else

14  is  the  same.

15  Q.        In  terms  of  your  knowledge  about  AMTALA,  about

16  obstetrics  and  gynecology,  how  has  that  changed  from

17  2004  --  from  the  last  time  you  practiced  medicine  until

18  today?

19  A.        It  hasn't  changed.

20        MR.  VIVAS:    Asked  and  answered,  Your  Honor.

21        THE  COURT:  Yeah.  I  think  it  has  been

22  answered.  But  are  you  finished?

23        MR.  SOLER  MUÑIZ:  Let  me  review  my  notes.  I

24  think  I  am.

25        THE  COURT:  Yes.

1          (Documents are reviewed)

2    BY MR. SOLER MUÑIZ:

3    Q.        Has -- has your license as a physician been

4    suspended or revoked?

5    A.        No.

6    Q.        Have your medical privileges ever been

7    suspended or revoked?

8    A.        Well, there was an instance at the oncologic

9    hospital where there was a confusion about the

10   necessity of the Drug Enforcement Administration

11   license to give narcotics.

12          I was not giving narcotics.  I was not -- I

13   didn't have a license for that because the hospital

14   already had a pain Center, so I had no license.  And

15   the medical director sent me a letter that she was

16   suspending my privileges because I didn't have the

17   license.

18          And I found out two days later -- I went to

19   him, and I -- because of my knowledge of the faculty,

20   half of the faculty at the oncologic hospital didn't

21   have a DEA number.  So, he had to reinstate me.

22   Q.        So, when -- when -- when were -- did you

23   receive that letter and when were you reinstated?

24   A.        That letter was sent Wednesday, that I was in

25   Manatí, I was not at the Centro Médico.  When I got

71

1    there Friday morning, I found out about the problem,

2    and I went to his office, and I "Well, let's -- let's

3    reason this, you know.  This is what's happening.  So,

4    you -- you have no grounds to suspend my privileges".

5              So, he had to reactivate my privileges.  Two

6    days.

7    Q.      Two days.

8              Have you been sued for medical malpractice?

9    A.      Yes.

10   Q.      How many times?

11   A.      3.

12   Q.      What happened with those cases?

13   A.      Well, one was dismissed, and the other two were

14   withdrawn -- withdrawn.

15       (Documents are reviewed)

16   Q.      In -- in terms of the sources of information

17   that you have used in this case to form your expert

18   opinion, how do those sources compare to the sources of

19   information that codefendant's experts used as you know

20   them?

21   A.      Well, we -- we use mostly the same literature,

22   the textbook, the Williams textbook, in order to reach

23   our conclusions.  Obviously, I use my training

24   experience.  I went to the literature applicable at the

25   time of when the baby was born.

72

1              And, maybe my study of the case included

2     obstetric pain.  I didn't see that they gave any

3     information about that.  But it's basically the same.

4     Q.       And in what topics of medicine are you

5     proposing that you testify as an expert in this case?

6     A.       Well, basically in obstetrics.

7              MR. VIVAS:   Objection, Your Honor.  He's not

8     here to say what he's going to testify and what he

9     doesn't allow himself to testify.

10             MR. SOLER MUÑIZ:  His proposed --

11             THE COURT:  Well, I -- well, no.  He was

12    proposed to be an expert specializing in obstetrics and

13    gynecology, that he was going to testify pertaining to

14    that field of medicine.  That's what I understood.

15             MR. VIVAS:   Well, that's the -- that's the

16    proposal.

17             THE COURT:  No, no.  He came here as an

18    expert in that.  I didn't know that he was practicing

19    any more.

20             So, that objection is sustained.

21             MR. SOLER MUÑIZ:  Okay.

22             THE COURT:  We know why -- why he's here.

23    Otherwise, we would not be here questioning.

24             MR. SOLER MUÑIZ:  Okay.  Your Honor, we don't

25    have any further questions.  We --

73

```
 1              THE COURT:  I'm sorry.  I forgot that the

 2   extension to 3:00 was for your benefit.

 3              MR. SOLER MUÑIZ:  That's -- that --

 4              THE COURT:  And, evidently, you won't be able

 5   to take advantage of that, because it's already 12 --

 6              MR. SOLER MUÑIZ:  25.

 7              THE COURT:  -- 25, but we're not going to

 8   meet here until 3:00.  But I have to let the other

 9   attorneys question the Doctor.

10              MR. SOLER MUÑIZ:  Okay.

11              THE COURT:  And I'm going to do it now.

12              MR. SOLER MUÑIZ:  I -- I understand, Your

13   Honor.

14              THE COURT:  Alright.

15              MR. SOLER MUÑIZ:  I'll see the pictures

16              THE COURT:  Alright.

17              MR. SOLER MUÑIZ:  So, we -- we submit Dr.

18   Carlos Ramírez as an expert in obstetrics and

19   gynecology and also as an expert within the field of

20   emergency medicine in AMTALA.

21              THE COURT:  Alright.  We have to be very

22   specific from now on, more than what we have been here.

23   If it's about AMTALA, I didn't know he was going to

24   testify as an expert in AMTALA.

25              Go ahead.  Questions?
```

74

1              MR. VIVAS:   May it please the Court?

2              For the record, José Héctor Vivas, on behalf

3     of Dr. Brenda Torres.

4                       CROSS EXAMINATION

5     BY MR. VIVAS:

6     Q.      Good afternoon, Doctor.

7     A.      Good afternoon.

8     Q.      You are retired as an active obstetrician since

9     2003.  Is that correct?

10    A.      In -- and 2.

11    Q.      2002?

12    A.      Yes.

13    Q.      Since 2002, you have not seen a woman in labor?

14    A.      No.

15    Q.      You have not taken care of a preterm labor

16    since at least 2002.  Is that correct?

17    A.      Yes.

18    Q.      You have not treated an incompetent cervix

19    since at least 2002?

20    A.      Yes.

21    Q.      Did you review the transcript of your

22    deposition for your testimony today?

23    A.      I saw it last week, yes.

24    Q.      And you read it?

25    A.      Yes.

75

1   Q.        Okay.   And you were asked what you were doing

2   at that time for a living?

3   A.        Yes.

4   Q.        And your answer was that you had a company with

5   your wife --

6   A.        Yes.

7   Q.        -- as you testified today, called Innovative

8   Quality Consulting, --

9   A.        Yes.

10  Q.        -- that it deals with cancer in two

11  institutions, --

12  A.        Yes.

13  Q.        -- about health issues, about faculty

14  credentialing for the Medicare advantage programs --

15  and I quote -- "And I do malpractice counseling"?

16  A.        Yes.

17  Q.        Okay.   So, part of what you do for a living is

18  testifying -- strike that -- is acting as an expert in

19  medical malpractice cases.   Is that correct?

20  A.        Well, I review records, and, if I decide to

21  take the case, I do.

22  Q.        Okay.

23  A.        That's -- that's a job, and I charge for that.

24  Q.        Okay.   My question is, Doctor, --

25  A.        Yes?

76

1   Q.      -- please listen to it -- is part of what you

2   do for a living today is doing work as an expert in

3   medical malpractice cases?

4   A.      Yes.

5   Q.      Yes.

6           And part of your income, Doctor, you also get

7   it -- part of your income, you also get it giving

8   seminars on medical malpractice?

9   A.      Yes.

10  Q.      Through [seminarios jurídicos]?

11  A.      Yes.

12  Q.      And you give that to attorneys at the [Colegio

13  de Abogados]?

14  A.      One of the seminars was at [Colegio de

15  Abogados].

16  Q.      And those seminars, the [seminarios jurídicos],

17  you give them jointly with Counsel Pedro Soler, counsel

18  for Plaintiff.  Is that correct?

19  A.      Yes.  He invites me, Yeah.

20          THE COURT:   [Seminarios jurídicos]?

21          MR. VIVAS:   [Seminarios jurídicos].

22          THE WITNESS:  Yes.

23          THE COURT:  He gives that jointly with

24  attorney?

```
 1              MR. VIVAS:   Pedro Soler, Counsel for

 2   plaintiffs.

 3              THE WITNESS:   And I also do it with Roberto

 4   Ruíz Comas and Roberto Reyes López.

 5   BY MR. VIVAS:

 6   Q.      How many seminars have you given jointly with

 7   Mr. Soler?

 8   A.      I think 3.

 9   Q.      3?

10   A.      Yes.

11   Q.      All about legal issues and the medicine?

12   A.      All about medicine and the law, Yeah.

13              THE COURT:   Medicine -- medicine and what?

14              THE WITNESS:   And the law.

15              MR. VIVAS:   Okay.

16   BY MR. VIVAS:

17   Q.      Doctor, and, right now, you're not board

18   certified in obstetrics and gynecology?

19   A.      I am board qualified.  I'm not board certified.

20   Q.      Okay.  And you have not been board certified

21   since 1997?

22   A.      Yes.

23   Q.      12 years ago?

24   A.      Yes.
```

1   Q.      And, before that, when you were active -- when
2   you were active as an obstetrician, you were board
3   certified?
4   A.      Not always.  Because, my first two years of
5   practice, 85-86-87, I was not board certified.  I was
6   board qualified.
7          THE COURT:  Well, he was board certified up
8   to 97.
9   BY MR. VIVAS:
10  Q.      Up to 97?
11  A.      Yes.  But I practiced obstetrics without being
12  board certified for five years.  When I did it three
13  years before I was board certified, and then, after
14  that, for five years, yes.
15  Q.      Okay.  And, Doctor, you testified that your
16  license, medical license with the now [Junta de
17  Licenciamiento Institucional Médica], former [Tribunal
18  Examinador de Médicos], --
19  A.      [Yes].
20  Q.      -- is inactive?
21  A.      Yes.
22  Q.      And that means you cannot practice medicine in
23  Puerto Rico?
24  A.      Yes.

79

1   Q.          That means you do not have privileges at any

2   hospital to treat obstetrics or gynecologic patients?

3   A.          I don't have privileges in any hospital.

4   Q.          You can not go to any doctor -- to any hospital

5   and treat any patient?

6   A.          No.

7   Q.          It would be illegal?

8   A.          It would be illegal to do with even in an

9   office.

10  Q.          Okay.  And you do not have any medical

11  malpractice insurance at this time?

12  A.          I don't have it since November 2003 when I

13  canceled it because I was going to retire.

14  Q.          Okay.  Doctor, are you a member of [Colegio de

15  Médicos Cirujanos de Puerto Rico]?

16  A.          No.

17  Q.          Are you a member of [American Medical

18  Association]?

19  A.          Not an active member.  Every physician in the

20  United States is a member, and we receive information

21  from them, but not an active member.

22  Q.          Are you a member of the American College of

23  cervix?

24  A.          No.

80

1   Q.        Are you a member of the American College of

2   obstetrics and gynecology?

3   A.        No.

4   Q.        Have you had any administrative complaints

5   filed by the [Medical examining board] for not having

6   recertified your license for the term of 2004 to 2007?

7   A.        Not that I know of.

8   Q.        Your answer is no or yes?

9   A.        No, not that I know of.  I went there in 2007

10  when they had the problem with the non certified

11  physicians, and they asked me to -- or, they offered to

12  retire my license.  That's all I know.

13  Q.        Do you have a certification from the [Medical

14  examining board] that they approved your retirement?

15  A.        No.

16  Q.        No?

17  A.        No.  What I have is the affidavit I took there.

18  Q.        But you never received an approval from the

19  [Medical examining board] of your request.  Is that

20  correct, Doctor?

21  A.        I didn't know I had to receive one, no.  I had

22  --

23  Q.        The question is very simple: did you receive an

24  approval of your request, Doctor?  Yes or no?

25  A.        An approval from them, no.

1    Q.        Doctor, and you testified that you have

2    testified as an expert or participated as an expert in

3    fields other than obstetrics and gynecology.  Is that

4    correct?

5    A.        Yeah.

6    Q.        And you said that you had testified in the

7    field of emergency medicine?

8    A.        Yes.

9    Q.        But you have also testified or accepted --

10   strike that.

11            You have also accepted cases on behalf of

12   plaintiffs, medical malpractice cases, for cosmetic

13   surgery?

14   A.        Yes.

15   Q.        And you have also, although you are not a

16   cosmetic or plastic surgeon.  Is that correct?

17   A.        Yes.  But that was a case about reconstructive

18   surgery, not plastic surgery.

19   Q.        Okay.  And you're not a reconstructive surgeon.

20   Is that correct, Doctor?

21   A.        Well, I do reconstructions in the pelvis.

22   Q.        You do reconstructions?

23   A.        Reconstructions.  Yeah.

24   Q.        You do them?

25   A.        Yeah.

1   Q.        When was the last time you did one, Doctor?

2   A.        Well, in a vulva carcinoma, you have to do

3   tissue transplants, --

4   Q.        Okay, Doctor, --

5   A.        -- expansions.   That's what I mean.

6   Q.        Okay.   You said "I do".   That means present.

7   A.        No, no, no, no, no.

8   Q.        I want to know when was the last time you did

9   one.

10  A.        Well, about 2003 probably.

11  Q.        Okay.   So, when you said "I do them", that is

12  not correct?

13            THE COURT:   Well, go ahead.

14            MR. VIVAS:    Okay.

15  BY MR. VIVAS:

16  Q.        Doctor, you testified that you have never been

17  disqualified as an expert in obstetrics and gynecology

18  in federal court?

19  A.        I -- I didn't hear the last part --

20  Q.        Okay.

21  A.        -- of your sentence.

22  Q.        Okay.   I'll repeat it.

23  A.        I'm sorry.

24  Q.        I'll repeat it.

1          You testified that you have never been

2 disqualified as an expert in obstetrics and gynecology

3 in federal court.  That was your testimony?

4 A.       Yes.

5 Q.       But now I ask you: the truth is that you have

6 never been offered as an expert in obstetrics and

7 gynecology in federal court?

8 A.       That's true.

9 Q.       So, there's no way you could have been

10 disqualified if you have and never been offered as an

11 expert in that field?

12 A.       Well, I wasn't -- I'm sorry.  Let me -- let me

13 correct my answer.

14          The case that was in default wasn't a

15 gynecology case.  So, I was qualified in gynecology.  I

16 haven't been qualified -- I haven't had the opportunity

17 of being qualified in obstetrics.  There, you're right.

18 Q.       Okay.  And this case deals about obstetrics?

19 A.       Yes.

20 Q.       And the only active association you belong now

21 is Society for law and ethics in medicine?

22 A.       Ethics -- Yeah.

23 Q.       And that deals with medical malpractice?

1    A.        That deals with various issues of bioethics.

2    It deals with law.  It deals with medical malpractice.

3    It deals with death issues, ostenasia.

4    Q.        Okay.

5         (Documents are reviewed)

6    Q.        And you answered to Counsel on several

7    abstracts and presentations you have presented?

8    A.        Yes.

9    Q.        But the truth of the matter is the last one was

10   in 1993?

11   A.        Maybe, or 94.  I don't remember.

12   Q.        Okay.

13   A.        Yes.

14   Q.        That's at least 15 years ago?

15   A.        Yes.

16        (Documents are reviewed)

17   Q.        And, you testified, Doctor, that your

18   understanding is just call the [Junta -- in your name,

19   [Junta de Licenciamiento y Disciplia Médica] --

20   A.        Yes.

21   Q.        -- which used to be the [Medical examining

22   board], and just tell them "I want to renew my

23   license".  You will have to offer evidence on the -- on

24   the credits that they require, and your license would

25   be active.  Is that --

85

1   A.        No.   I said that I have to go there and see

2   what I needed to comply with them.

3   Q.        Okay.

4   A.        Within the things I know they are going to ask

5   is continuing medical education, and I have that.

6          The other things, whatever they are, they'll

7   have to tell me.

8   Q.        Okay.  And it's not automatic, because the

9   [Board] can determine whether they will approve your

10  request or not?

11  A.        Sure.  They have the power.

12      (Documents are reviewed)

13          MR. VIVAS:   I have no further questions.

14          THE COURT:  Alright.

15          MR. VIVAS:    Thank you, doctor.

16          THE COURT:  We will recess until 3:10.  We'll

17  be back here at 3:10.  And, at that time, I will have

18  decided.

19          MR. VIVAS:   Your Honor, may I please the

20  Court --

21          THE COURT:  Yes.

22          MR. VIVAS:   -- very briefly?

23          THE COURT:  Yes.

24          MR. VIVAS:   I request that Dr. Ramírez not

25  be a party, and, he, being under oath right now, that

1    he be instructed that he cannot meet or talk with

2    anyone until he comes back to continue his testimony,

3    because he's subject to cross-examination by the other

4    attorneys.

5                THE COURT:  Oh, I see.  No, we'll do that.  I

6    thought you were going to be the only one.  We'll do

7    that, okay, now.

8                MR. VIVAS:  Oh, okay.  Okay.

9                THE COURT:  No.  I thought you were the only

10   one.

11               MR. VIVAS:  Okay.  I'm sorry.

12               THE COURT:  I'm sorry.  I thought that was

13   the end.

14               MR. IRIZARRY IRIZARRY:  For the record, Your

15   Honor, may it please?  Anselmo Irizarry Irizarry.

16                        CROSS EXAMINATION

17   BY MR. IRIZARRY IRIZARRY:

18   Q.      Good afternoon, Dr. Ramírez.

19               THE COURT:  Well, will finish this thing now.

20   There's no reason to wait for a recess.  Go ahead.

21   BY MR. IRIZARRY IRIZARRY:

22   Q.      Dr. Ramírez, do you agree with me that AMTALA

23   is not a hospital protocol?

24   A.      It's not a hospital protocol.

25   Q.      Neither a law of federal hospital malpractice?

87

1  A.        Excuse me?

2  Q.        Neither a law of federal hospital malpractice?

3  A.        It's not a law of federal malpractice.

4  Q.        It's a law, and, therefore, by law has to be

5  continued (sic) by the judges, right?

6  A.        Of course, Yeah.

7  Q.        Okay.  There is no specialty in medicine

8  regarding that you are board certified or you have a

9  specialty in AMTALA?

10 A.        I don't think anyone can claim that, no.  In

11 medicine, no.

12 Q.        Alright.

13     (Documents are reviewed)

14 Q.        You have mentioned that you have been an expert

15 in a case of reconstructive.  That's correct?

16 A.        Yes.

17 Q.        That was a case in Mayaguez?

18 A.        Yes.  With you.

19 Q.        I was the attorney for the Defendant.  That's

20 correct?

21 A.        You was -- you were the attorney, a very

22 effective attorney for the defense.

23 Q.        Thank you very much.

24           Doctor, do you remember the outcome of that

25 case?

88

1   A.        I know your side won, but I don't know the

2   details.

3   Q.        Doctor, in order to be a member, an active

4   member of a faculty, what are the requirements?

5   A.        Well, in order to be an active member of the

6   faculty, you have to decide which departments you are

7   going to go, for example, surgery.  In the hospitals I

8   have worked, you have to be a board eligible surgeon,

9   which means that you were trained in an accredited

10  program.  You have to provide your license.  You have

11  to provide your medical malpractice, your certificate

12  of continuing medical education, letters of

13  recommendations, Health issued card, other things, a

14  photograph.

15  Q.        Okay.  Regarding to your current professional

16  situation, it's correct to say that you cannot be a

17  member, an active member of any faculty?

18  A.        No.

19  Q.        Okay.  Will you please explain to me why your

20  curriculum vitae, updated to 2008, it says that you are

21  active faculty doctors Hospital in Manatí, consultant

22  for the Cancer Center in 1984 to present?

23  A.        If it says active, it's a mistake.  Because,

24  what I do is consulting for the cancer center.  I don't

1    see patients.  I don't have privileges in the hospital.

2

3            I just am an advisor to the cancer committee.

4    I am not a faculty member.

5    Q.      As adviser in order how to handle patients?

6    A.      Well, for example, techniques about gynecologic

7    cancer.

8    Q.      For -- for one specific case?  They present to

9    you a case of Mr. X or Mrs. Y?

10   A.      Mrs. Y probably.  Mr. X, I don't do that.

11   Q.      And they present the case to you, and then you

12   make -- you make a recommendation of how to handle that

13   case?

14   A.      I make a recommendation on how to want to

15   handle, what information to look for, where -- where to

16   consult it in other areas of -- outside of Puerto Rico

17   in the --

18   Q.      That means the treatment and management of that

19   patient's condition?

20   A.      No.

21   Q.      No?

22   A.      No.  The treatment and past management of a

23   patient's condition is the responsibility of the

24   attending physician that has that -- the way it's set

25   up is, if it's a surgeon or if it's the chemotherapist.

1  Q.      But you are providing advice to that specialty?

2  A.      Well, if he asks me, of course.  If I find

3  someone in the street that wants my opinion on

4  medicine, I can give it.

5  Q.      Which means that you indirectly provide medical

6  treatment?

7  A.      I wouldn't say it that way.  I would say if I

8  saw it that way, I wouldn't do it.  I see it as I am

9  helping a colleague and a human being improve on his

10  condition.  If -- if that's -- I don't say it that way.

11  Q.      And how much do you charge for that service?

12  A.      No, I don't charge for that service.

13  Q.      Do you know to whom belongs [seminarios

14  jurídicos]?

15  A.      I understand it's Mr. Soler's --

16  Q.      Mr. Pedro Soler, Plaintiff's attorney?

17  A.      Yes.  I am -- I understand it's his.  I don't

18  know if it's a corporation or what, or an

19  incorporation, I don't know.

20      (Documents are reviewed)

21          MR. IRIZARRY IRIZARRY:  Okay.  Let me check.

22  I think I have already finished.  Oh, yes.

23  BY MR. IRIZARRY IRIZARRY:

1  Q.       You also have testified that you have been

2  qualified an expert in emergency medicine.  That's

3  correct?

4  A.       Yes.

5  Q.       However, emergency medicine is another

6  specialty in the medicine field?

7  A.       There are emergencyologists which are board

8  certified -- or, the board eligible persons who train

9  specifically in emergency medicine.

10 Q.       They have to go to a resident program for that?

11 A.       A three-year residency program.

12 Q.       But you don't have that kind of program with

13 you -- you don't have never been to that program?

14 A.       No, I haven't.

15 Q.       You never have been certified by the [Medical

16 examining board] of Puerto Rico as an emergencyologist?

17 A.       No, I haven't.

18        MR. IRIZARRY IRIZARRY:  Thank you very much.

19        THE COURT:  The next one?

20        MR. MIRANDA DALECCIO:  May it please the

21 Court?  José Miranda Daleccio for the record.

22                     CROSS EXAMINATION

23 BY MR. MIRANDA DALECCIO:

24 Q.       Now, Doctor, let me make sure that we have some

25 facts right.

1            Your insurance coverage, your malpractice
2   insurance coverage was suspended because of a failure
3   of payment.
4   A.        Yes.
5   Q.        Is that what happened?
6   A.        Yeah, I stopped paying it --
7   Q.        Okay.
8   A.        -- because I was not going to use it anymore.
9   Q.        Okay.  Something else I need to get clear: You
10  stated that you have been teaching students for 26
11  years?
12  A.        If I have the math right, Yeah.  It sounds
13  right.  Since -- since I graduated.
14  Q.        Well, I want to give you the opportunity,
15  because, as far as that answer is concerned, you've
16  been teaching more time than you have been a doctor.
17  A.        Well, probably.
18            THE COURT:  Teaching?  Teaching?
19            THE WITNESS:  It's been 22 years.
20            MR. MIRANDA DALECCIO:  Teaching, yes.
21            THE WITNESS:  Then, it's 22 years.  Yeah.
22  BY MR. MIRANDA DALECCIO:
23  Q.        Okay.  Okay.
24  A.        Sorry.
25  Q.        I don't want to --

93

1   A.        Sorry for the confusion.

2   Q.        -- I don't want exaggerations.  That's what I

3   want.  Okay.

4             And your honorary designation as an attending

5   in the surgery department, honorary means that you do

6   not get paid?

7   A.        No, it was ad anotum (sic) , yes.

8   Q.        So, you stand --

9   A.        I was not getting paid.

10  Q.        Okay.  So, you stand corrected that it is not

11  an honorary designation but an ad anotum (sic)

12  designation?

13  A.        I never said honorary.  I said ad anotum all

14  the time.

15  Q.        Well, I'm going to correct my notes.

16  A.        Yeah.

17  Q.        Thank you.

18  A.        No, no.  I never said honorary.

19            To me, it was an honor, but it was not

20  honorary.

21       (Documents are reviewed)

22  Q.        Of those publications that you enumerated that

23  are contained in your 2008 version of your curriculum

24  vitae, --

25  A.        Yes?

94

1    Q.        -- none of them -- I mean, let me rephrase.

2               The -- of all those, there's only one that

3    mentions the subject gynecology, correct?  -- which is

4    the first one on the list.

5    A.        Let me check.

6    Q.        Go ahead.

7    A.        You mean the Journal?  It was published.

8    Q.        No, no.  Go to the list.

9         (This is done)

10   A.        Well, there is one that mentions gynecology.

11   But all of them are gynecological.

12   Q.        Isn't it true that all of them are about

13   gynecological cancer?

14   A.        Yes.

15   Q.        And isn't it true also that those, that list

16   that you have there, are not publications that appear

17   in medical literature, but it's a reference that you're

18   making to meetings where you presented those papers?

19   A.        No, no, no.  These are publications.  One is in

20   obstetrics and gynecology, which is the Journal of the

21   American College at.

22   Q.        Okay.

23   A.        The other one is in gynecologic -- Journal of

24   gynecologic surgery.  And the other one is the surgery

25   seminars, which is the surgical Journal of the JAMA.

95

1   Q.        Okay.   JAMA is --

2   A.        Journal of American Medical Association.

3   Q.        Okay.  Now, Doctor, when you stated that you

4   have been moonlighting, in the good a proper sense for

5   this case, --

6   A.        Yes.

7   Q.        -- in an emergency room, --

8   A.        Yes.

9   Q.        -- the truth is that you were moonlighting

10  there or you were taking care of patients in those odd

11  hours of the night, limited to gynecological patients?

12  A.        No.  No.

13  Q.        So, you mean to tell me that, when you attended

14  to patients in the emergency room for that period of

15  time, you took care of everybody in the --

16  A.        No, not of everybody.  Obviously, we saw mostly

17  gynecologic and obstetrical patients --

18  Q.        Okay.

19  A.        -- but we were consulted, for example, by

20  surgery, by urology, by orthopedics.  So, we saw

21  different patients.

22  Q.        Okay.

23  A.        From different specialties.

24  Q.        Is it fair to say that, if we exclude your

25  testimony pertaining to oncology and your testimony

1    pertaining to general surgery and pertaining to your

2    experience in pelvic surgery, the truth is that, from

3    all of that, and since 1981, we end up with you being

4    exposed to obstetrics during your residency to the arue

5    (sic) patients in Arecibo, and that's it?

6    A.       Well, I saw patients also in the hospital, at

7    the University Hospital.  I saw obstetric patients.

8             We're talking about -- you're talking about

9    prior cases?

10   Q.       Yes.

11   A.       And you're right.

12   Q.       Oh, Yeah, thank you.

13   A.       But I -- I --

14   Q.       I'm right?

15   A.       Not always.

16           THE COURT:  Yeah, go ahead.  Go ahead.

17           THE WITNESS:  Well, my private obstetric

18   patients, my practice, was three years after my

19   graduation as a resident.  And then, at the Manatí

20   Center or at the Arecibo area of health reform, those,

21   for eight years.

22           MR. MIRANDA DALECCIO:  Okay.

23           THE WITNESS:  But I continued seeing,

24   intermittently, obstetric patients in Centro Médico.  I

25   was an attending in two hospitals.

1   BY MR. MIRANDA DALECCIO:

2   Q.      Obstetric patients is a lady that is pregnant?

3   A.      Yes.

4   Q.      That does not mean labor?

5   A.      Yes.

6   Q.      Okay.  The truth is, Doctor, that, from 1989 to

7   1997, that period of time that you spent at -- well,

8   let me go back.

9           Your private practice since 1985 to 1997 --

10  I'm talking about that period of time --

11  A.      Yes?

12  Q.      -- the truth is that, during that period of

13  time, at least from 1989 to 1997, you did not attend a

14  labor?

15  A.      No, that's wrong.

16  Q.      That's wrong?

17  A.      Because, in Arecibo, in the -- on Mondays, I

18  was in the labor room there as well as in the office.

19  Q.      Okay.

20  A.      So, I did attend -- not many, but I did attend

21  labors.

22  Q.      But, within your private practice at El Amal?

23  A.      No.  At El Amal, I stopped seeing obstetrics in

24  1988.

25  Q.      But you did not -- 19?

98

1    A.        88.

2    Q.        88.

3         (Documents are reviewed)

4    Q.        In that default hearing that you were able or

5    you were allowed to testify, Doctor, your testimony was

6    pertaining to damages.  That's a correct statement?

7    A.        No.  It was pertaining to malpractice.

8    Q.        So, it was not a default hearing?

9    A.        Yes, it was a default hearing, because the

10   person we mentioned, Dr. Pérez Toledo, did not respond

11   to the complaint.

12   Q.        Okay.

13   A.        So, it was in [rebeldía].

14   Q.        Exactly.  So, in that default hearing, you were

15   taken there for the damages hearing?

16   A.        They asked me about malpractice.

17   Q.        Do you know or do you not know?

18            THE COURT:  No, just --

19            MR. MIRANDA DALECCIO:  Maybe you do not know.

20

21            THE COURT:  -- when there is a default in

22   agencies and the malpractice are accepted, that do not

23   further disrupt --

24            MR. MIRANDA DALECCIO:  Well, that -- okay.

1          THE COURT:  -- from the hearing.  And then,

2   what they have to prove are the damages.  That's the

3   way they go.

4          MR. MIRANDA DALECCIO:  Okay.

5          THE WITNESS:  Okay.

6          MR. MIRANDA DALECCIO:  Well, then, --

7          THE COURT:  And that's where the questions

8   are directed.

9          THE WITNESS:  Well, then, it was a damage

10  hearing.

11  BY MR. MIRANDA DALECCIO:

12  Q.     Okay.

13  A.     You're right.  I'm sorry.

14          MR. MIRANDA DALECCIO:  That's it, Your Honor.

15  Thank you.  That's more than enough.

16          THE WITNESS:  I'm sorry for my -- you know,

17  that's --

18          MR. MIRANDA DALECCIO:  Thank you.

19          THE COURT:  More questions?

20          MR. VÁZQUEZ SANDOVAL:  May it please the

21  Court?

22          THE COURT:  Go ahead.

23          MR. VÁZQUEZ SANDOVAL:  Humberto Vázquez for

24  Advanced ob/gyn.

25                  CROSS EXAMINATION

1    BY MR. VÁZQUEZ SANDOVAL:

2    Q.        Dr. Ramírez, --

3              THE COURT:  Who's that -- who's that group?

4              MR. VÁZQUEZ SANDOVAL:  I'm sorry.  Advanced

5    ob/gyn, pse.

6              THE COURT:  And your name is?

7              MR. VÁZQUEZ SANDOVAL:  Humberto Vázquez, Your

8    Honor.

9    BY MR. VÁZQUEZ SANDOVAL:

10   Q.        Now, Dr. Ramírez, have you ever been notified

11   by the Puerto Rico Medical Board, formally known as the

12   [Medical examining Board], of a disciplinary proceeding

13   being opened against you for any reason?

14   A.        Not that I know of, no.

15   Q.        Now, talking about these CME courses that you

16   have been testifying today --

17   A.        Yes?

18   Q.        -- about, you take them voluntarily.  Is that

19   right?

20   A.        Yes.

21   Q.        And you say that you read the materials on your

22   own, and then you take an exam.  Is that the way --

23   A.        Yes.  And they approve or not approve the

24   credit.

1   Q.        Do you have any proof of these courses having

2   been approved or --

3   A.        Yeah, sure.  Sure.

4   Q.        You do?

5   A.        If I ever want to go back to medicine,  I know

6   I have to provide proof that I did that.

7   Q.        What would that proof be?

8   A.        Well, based on your certification, if you ask

9   for it, every time you finish the course, or if at the

10  end of the year, there are different.  It goes into my

11  e-mail.

12  Q.        Have you produced those certificates to

13  Plaintiff's Counsel in this case?

14  A.        I don't think so, no.

15  Q.        You have not?

16  A.        No.  Never asked.

17  Q.        Have you -- have you presented those

18  certificates to the Puerto Rico Medical Board?

19  A.        No.

20  Q.        Formerly known as --

21  A.        When I took them -- when I planned to recertify

22  in 2007, and they never asked, because we decided on

23  inactivating my license because of my status as a

24  retired physician.

1          But I took them there, and they never got to

2    see them.

3    Q.      You took them in what year?

4    A.          During the recertification process in 2007.

5    You know, all these things, what -- what -- it had to

6    be for June 30th, and they kept on prolonging it until

7    September 30th because of the investigation of the

8    fraudulent physicians.  There was a -- they delayed the

9    deadline to September 30th.

10          During that time and in that hectic three

11   months that the TEM was going through, I went there

12   voluntarily to look in -- to give them my CME's, but,

13   upon discussing this with the chief counsel of the TEM,

14   he recommended that I didn't activate my license

15   because I was not practicing.

16   Q.      And you said this was in 2000?

17   A.      That was in 2007.

18   Q.      And seven?

19   A.      Yes.

20   Q.      As I understood your testimony, in 2007, you

21   did not have an active license --

22   A.      Well, I recertified in 2004, notifying the

23   [Medical examining board] that I was retired -- okay?

24   I don't know what -- how -- what classification they

25   put me on.  But, when they found out that I had been

1  retired since 2004, they recommended that I inactivate
2  my license in 2007.
3          I don't know what they did in the meantime.
4  I was not practicing obviously.
5  Q.      You  were not practicing?
6  A.      Since 2003, I was not practicing medicine.
7  Q.      Yet, you provided, as you say, you provided CME
8  credits to the Board in 2007?
9  A.      Well, I offered them.  I offered them, and they
10 did not take them on.  I took them there, because I
11 planned to recertify for an active license, as I did
12 in 2004.
13         But, since I was retired, they recommended me
14 that I inactivate my license.
15 Q.      Alright.  What about any courses that you have
16 taken since then?
17 A.      Yeah.  I continue my education.
18 Q.      Have you also provided those certificates to
19 the Board?
20 A.      No.  I haven't gone there.  They are in a
21 transition process right now, and I don't find anyone
22 there that can help right now.
23 Q.      Alright.  So, your status, since -- since 2007,
24 is that you have no license active to practice medicine
25 in Puerto Rico?

1   A.        I have a license to practice medicine.  It is

2   inactive.

3   Q.        But, Doctor, doesn't that mean that you're not

4   really authorized to treat patients?

5   A.        I cannot treat patients since I have no

6   malpractice since November 2003.  The law requires me

7   to have a malpractice insurance to practice.

8            Even if I have -- don't have a license.

9   Q.        Isn't it -- isn't it true, Doctor, that your

10  license from the Puerto Rico Medical Board, at present,

11  does not authorize you to treat patients in Puerto

12  Rico?

13  A.        I cannot treat patients in Puerto Rico, no.

14  Q.        Do you remember giving me your deposition in

15  November of 2008?

16  A.        Yes.

17  Q.        Now, you remember that I asked you about the

18  status of your license during that deposition?

19  A.        Yes.  Yes.

20  Q.        And you told me, on November 19, 2008, that you

21  were at that time in the process of reactivating your

22  medical license in Puerto Rico?

23  A.        Yes.  That's true.

24  Q.        And that was four months ago --

25  A.        Yes.  That's --

1   Q.       -- maybe a little more than that.

2   A.       Yeah, that's true.  But --

3   Q.       But at this -- at this date, today, you still

4   do not have an active license --

5   A.       I -- I haven't gone to --

6   Q.       -- in Puerto Rico?

7   A.       -- I haven't gone to request, because they were

8   in the transition.  They are in the transition process

9   of dismantling the [Medical examining board] and

10  forming the [Medical disciplinary board].

11           So, haven't gone there until this settles

12  down.

13  Q.       And you have not provided to them --

14  A.       No.  I haven't.

15  Q.       -- certificates for CME, for continuing medical

16  education?

17  A.       No.

18  Q.       Even though you have testified today that that

19  would be the first thing you would do, because you know

20  --

21           THE COURT:  Alright.  Alright.  Let's go

22  ahead.  It's clear in my mind.  Let's go to another

23  subject.

24           MR. VÁZQUEZ SANDOVAL:  Nothing -- nothing

25  further, Your Honor.  Thank you.

1          THE COURT:  Alright.  No, plaintiffs, I don't
2    want --
3          MR. ORTIZ VÉLEZ:  No, no.  I'm not asking any
4    questions.
5          THE COURT:  -- I don't want to hear you.
6          MR. ORTIZ VÉLEZ:  With the permission of the
7    Court, if I may?  José Vélez for plaintiffs.  To
8    certain specific cases, just a citation, --
9          THE COURT:  But what -- what?
10         MR. ORTIZ VÉLEZ:  To a specific citation from
11   the First Circuit regarding the First Circuit's rules
12   on extra qualifications.  It's a case of Gaydar --
13   that's G-a-y-d-a-r -- vs [Sociedad Instituto Gíneco-
14   Qirúrico], and it's found at 345 F. 3rd 15.  It's a
15   2003 opinion by Judge Lipitz.
16         That's all I wanted to say, Your Honor.
17         THE COURT:  Circuit courts don't enter rules.
18   They enter opinions.
19         MR. ORTIZ VÉLEZ:  I'm sorry?
20         THE COURT:  That the circuit courts do not
21   enter rules.  They enter opinions.
22         MR. ORTIZ VÉLEZ:  I understand that.  It's
23   the interpretation of federal rules as evidence.
24         THE COURT:  And their opinions have to be
25   interpreted.

1            MR. ORTIZ VÉLEZ:  Of course, Your Honor.

2            THE COURT:  Because, Judge Pieras also enters

3    opinions.

4            MR. ORTIZ VÉLEZ:  And Judge Pieras is in

5    charge here.  I understand that.

6            THE COURT:  Alright.

7            MR. ORTIZ VÉLEZ:  Thank you.

8            THE COURT:  Doctor, you may go back.

9            THE WITNESS:  Thank you, sir.

10            THE COURT:  I'll see you at 3:10.

11            COURTROOM MARSHAL:  All rise.  Court in

12    recess until 3:00.

13        (Recess until 3:00 p.m.)

14        (Hereupon concludes record of this Daubert

15    Hearing for this day)

16                            (1:04 p.m.)

17

18

19

20

21

22

23

24

25

CERTIFIED TRANSCRIBERS INC.
1075 Carr.  2 Cond.  Plaza Suchville #302
Bayamon, Puerto Rico 00959
Tel. # (787)783-6623

1                    TRANSCRIBER CERTIFICATION

2

3           I, CRYSTAL INCHAUSTEGUI BREAZ, Transcriber, do

4    hereby certify that the foregoing transcript was

5    transcribed by me to the best of my abilities.

6

7           I CERTIFY that all "(inaudible)", "(phonetic)",

8    and "(unintelligible)" were carefully reviewed and

9    found to be as written.

10

11          I FURTHER CERTIFY that I am not interested in

12   the outcome of the case mentioned in said caption.

13

14                      S/ CRYSTAL INCHAUSTEGUI

15                      CRYSTAL INCHAUSTEGUI BREAZ

16

17          I, DIANE BREAZ, RPR and Official Court Reporter

18   for the District Court of Puerto Rico, certify that the

19   foregoing transcript has been verified and certified by

20   me.

21

22                      S/ DIANE BREAZ

23                      DIANE BREAZ

24

25

CERTIFIED TRANSCRIBERS INC.
1075 Carr.  2 Cond.  Plaza Suchville #302
Bayamon, Puerto Rico 00959
Tel. # (787)783-6623