IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

HAZEL I. CRUZ-VÁZQUEZ, et al.,

          Plaintiffs

               v.

MENNONITE GENERAL HOSPITAL,
INC., et al.,

          Defendants

CIVIL NO.  08-1236 (JP)

## OPINION AND ORDER

Plaintiffs brought the instant action pursuant to the Emergency Medical Treatment and Active Labor Act ("EMTALA"), and Articles 1802 and 1803 of the Puerto Rico Civil Code, P.R. Laws Ann. tit. 31, sections 5141-42.  Plaintiffs allege that Defendants' medical malpractice and violation of EMTALA caused Plaintiff Hazel Cruz-Vázquez ("Cruz") to give birth to a premature baby girl whose incomplete development resulted in a lung disease that caused the baby's death within two days after it was born.

A jury trial in this case began on March 30, 2009.  Plaintiffs presented the factual testimony of six witnesses: Plaintiffs Cruz, Raúl Cruz-Rivera, Lucy Vázquez-Rivera, Benjamín Martínez-Reyes, Benjamín Martínez-Morales, and Nitza I. Reyes.  Plaintiffs then offered the testimony of Dr. Carlos E. Ramírez ("Dr. Ramírez") as an expert witness.  On April 2, 2009, Defendants presented the Court with an oral motion to exclude the testimony of Dr. Ramírez, which

CIVIL NO. 08-1236 (JP)          -2-

the Court verbally granted.  Plaintiffs then rested their case, and Defendants presented an oral motion for judgment as a matter of law pursuant to Rule 50(a) of the Federal Rules of Civil Procedure, which the Court also verbally granted.  The Court informed the parties that a written opinion would follow discussing both rulings.  Accordingly, for the reasons stated herein, Defendants' motions to exclude Dr. Ramírez's testimony and for judgment as a matter of law are **GRANTED**.

I.    **FACTUAL BACKGROUND**

    The following uncontested facts were agreed to by the parties hereto at the Initial Scheduling Conference on June 27, 2008.  The facts were originally proposed by the parties in accordance with the "call" (No. 20) entered by the Court pursuant to the Judge's Initial Scheduling Conference method.  The uncontested facts were given to the jury at trial.

    1.   Plaintiffs sent a letter dated December 27, 2007, to Defendants Mennonite General Hospital, Inc. ("Mennonite") and Dr. Eduardo Gómez ("Dr. Gómez") via certified mail, which was received on January 2, 2008.

    2.   Defendant Mennonite is a medical institution subject to EMTALA.

    3.   Defendant Dr. Brenda Torres-Pérez ("Dr. Torres") is a physician, fully authorized to practice medicine in the Commonwealth of Puerto Rico, who has been granted privileges to do work in the

CIVIL NO. 08-1236 (JP)          -3-

emergency room by co-Defendant Mennonite.  She is employed by RMB
Corp.  Dr. Torres is of legal age, married to Mr. Amílcar Vélez and
resident of Road 176, Camino Dr. Juliá, Cupey Alto, San Juan, Puerto
Rico.

    4.   Defendant Dr. Gómez is an obstetrician and gynecologist
duly authorized to practice medicine in the Commonwealth of Puerto
Rico who had privileges to practice in all the medical facilities of
Defendant Mennonite at the times subject of this case.  Dr. Gómez is
an obstetrician and gynecologist with a private medical office
located at El Jíbaro Avenue, Parque Industrial, Centro de Salud
Menonita, Suite 101, Cidra, Puerto Rico.

    5.   Defendant Dr. Gómez is Plaintiff Cruz's primary OB-GYN
physician and was not an employee of Mennonite at the time of the
alleged facts.

    6.   Defendant Advanced OB-GYN, PSC is a Professional Services
Corporation of which Defendant Dr. Gómez is an owner and/or president
and/or shareholder for the practice of obstetrics and gynecology.
It is a legal entity authorized and with operations under the laws
of the Commonwealth of Puerto Rico.

    7.   Plaintiff Cruz became a patient of Dr. Gómez for her
prenatal care on August 10, 2006. Cruz was further seen by Dr. Gómez
for prenatal care on August 24, August 26, September 26, October 10,
October 24, November 21, and December 19, 2006; and on January 4,
2007.

CIVIL NO. 08-1236 (JP)          -4-

8. Cruz's prenatal care and progress was completely uneventful, including her regular visit on January 4, 2007 at 2:00 p.m.

9. At said visit, on January 4, 2007, Dr. Gómez wrote in a progress note that Cruz had a blood pressure of 120/70, the fetal cardiac rhythm was present, she was twenty-seven weeks and four days pregnant, with a fundal height of thirty centimeters, with no vaginal bleeding, no vaginal "D/C," no suprapubic pain, no low back pain, and with an active fetus.

10. Cruz's estimated date of labor was April 1, 2007, as per Dr. Gómez's medical record.

11. As per the medical records, during prenatal care the laboratory results were normal.

12. On January 4, 2007, Plaintiff Cruz, the only plaintiff who requested medical services on January 4, 2007 at Mennonite in Cidra, arrived to the emergency room of Mennonite in Cidra at 10:15 p.m. with complaints of vaginal discharge and occasional blood spotting within the prior half hour. Cruz denied pelvic pain, dysuria, or fever, and was feeling fetal movements.

13. Cruz was evaluated by Dr. Torres, who performed a vaginal or pelvic exam on Plaintiff Cruz and found that the cervix was not dilated.

CIVIL NO. 08-1236 (JP)          -5-

14.  Dr. Torres provided certain medical care and treatment to Plaintiff Cruz on January 4 and 5, 2007, at Mennonite, as per the medical record.

15.  Cruz was with 27 4/7 weeks of gestation and was in her third trimester.

16.  As per the medical record, Dr. Torres called Dr. Gómez, Cruz's obstetrician, at 10:55 p.m. to speak to him about Dr. Torres' examination of Cruz.  Dr. Gómez advised Dr. Torres to administer Bretine 0.25 and Vistaryl 50mg, to discharge Cruz in stable condition, and to instruct follow-up at Dr. Gómez's private office on the morning of January 5, 2007 at 8:00 a.m., instructions which were followed.

17.  As per Mennonite's medical record, there is one annotation stating "FHR = 160."  A nurse's note in the medical record states that Plaintiff Cruz was re-evaluated at 12:15 a.m. by "M.D." who ordered discharge on January 5, 2007, to have a follow-up with OB-GYN.

18.  According to the medical record, Cruz was sent home on January 5, 2007, at 12:15 a.m., less than two hours after her arrival.  Cruz's condition was recorded on the medical record as "discharge condition stable."

19.  On January 5, 2007 at 8:14 a.m., Cruz was seen by Dr. Gómez at his office.  She complained of blood spotting since the previous night but no pain.

CIVIL NO. 08-1236 (JP)          -6-

20.  A pelvic evaluation of Cruz revealed normal genitalia, no masses in the bartolin urethra skinny gland, no infection, no neoplasia, and no trauma.

21.  A blood collection (pool) was found in the vagina.  Cruz was also found to be dilated seven (7) centimeters with bulging membranes and the baby floating in breech position.  The fetal cardiac rhythm was 142 beats per minute.

22.  Dr. Gómez determined that Cruz was suffering from an incompetent cervix.  Cruz and her mother, Plaintiff Lucy Vázquez-Rivera, were oriented as to Cruz's and the baby's condition, diagnosis and prognosis, and the need for transfer to Puerto Rico Medical Center.  Both agreed to the transfer.

23.  Dr. Gómez was informed that Dr. Gracia at University District Hospital, Puerto Rico Medical Center would accept Cruz, and Cruz was transferred in stable condition from Dr. Gómez's office with orders.

24.  Plaintiff Cruz was admitted to the San Juan City Hospital, where a cesarean section was done due to the prematurity of the baby.

25.  Cruz's baby was born at 12:12 p.m. on January 5, 2008 and was a living baby girl, APGAR 3/5 with a weight of two pounds fourteen ounces.

26.  The baby died on January 7, 2007 at 7:57 a.m.

27.  On the date of the facts of this case, Mennonite had in place and in full force and effect in all of its facilities a "Gravid

CIVIL NO. 08-1236 (JP)          -7-

with 3rd Trimester Bleeding" Protocol requiring the following tests to be performed on the patient:

1.   3rd trimester bleeding must be differentiated from bloody show by speculum exam;

2.   The most likely diagnosis of 3rd trimester bleeding is placenta previa or abruption;

3.   The gestational age must be determined;

4.   Look for rupture of membranes;

5.   Fetal movements;

6.   Fetal heart rate tones by Doppler must be measured;

7.   Vital signs as blood pressure, pulse, and temperature must be acquired;

8.   The following laboratories must be practiced:

a.   CBC

b.   Urinalysis

c.   Serology

d.   PT, PTT

e.   Platelet count

f.   T & Screen or T & Cross match

g.   Serum fibrinogen, fibrin split product of hemorrhage only if > B/P (preeclampsia, eclampsia).

9.   Open a vein with a catheter;

10.  Start Ringer lactate at 125 cc/hr;

CIVIL NO. 08-1236 (JP)          -8-

     11.  Send patient to LR in stretcher.

    28.  Mennonite    failed    to    activate    Mennonite's    "Gravid with 3rd Trimester Bleeding" Protocol in this case.

    29.  Cruz visited the office of Dr. Gómez for postpartum management on January 18, 2007, with clean and dry wound secondary to cesarean section, and diagnosis of incompetent cervix, neonatal death, and for contraceptive counseling.  The diagnosis of incompetent cervix was made by Dr. Gómez.

    30.  Cruz again visited the office of Dr. Gómez for posparum management on February 15, 2007 for a postpartum routine visit and contraceptive counseling and prescription.

    31.  On March 1, 2007, Cruz visited the office of Dr. Gómez when normal pap smear results were given.

## II.  **ANALYSIS**

### A.  **Motion to Exclude Expert Witness**

After presenting the testimony of six factual witnesses, Plaintiffs called Dr. Ramírez to testify as an expert witness. Defendants presented a verbal motion to exclude Dr. Ramírez's testimony on the issues of obstetrical standards of care, medical emergencies involving obstetrics, and, specifically, issues regarding premature labor.  The Court conducted a <u>Daubert</u> hearing, outside the presence of the jury, in which all parties were permitted to ask questions regarding Dr. Ramírez's qualifications and experience, and in particular regarding his understanding of the issues involved in

CIVIL NO. 08-1236 (JP)          -9-

the instant case.   See Daubert v. Merrell Dow Pharmaceutical, 509 U.S. 579 (1993).

### 1.   Plaintiffs' Failure to Provide Current C.V.

One of the reasons for the Daubert hearing was that Plaintiffs had not provided Defendants or the Court with a current curriculum vitae ("C.V.") for Dr. Ramírez prior to trial.  Although Plaintiffs previously produced Dr. Ramírez's C.V. as updated through 2004, they offered a C.V. updated through 2008 for the first time at trial.  The Court had specifically ordered the parties to file the report and C.V. for their respective expert witnesses (No. 54).  Plaintiffs' failure to provide an updated C.V. for their expert witness contradicts said Order, and violates Rule 26(a)(2)(B) of the Federal Rules of Civil Procedure, which states that the disclosure of a report from an expert witness must include:

> the witness's qualifications, including a list of all publications authored in the previous 10 years; [and] a list of all other cases in which, during the past four years, the witness testified as an expert at trial or by deposition.

Id.  In addition, Rule 37(c)(1) provides:

> Failure to Disclose or Supplement.  If a party fails to provide information . . . as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence . . . at trial, unless the failure was substantially justified or harmless.

In the present case, updated information regarding Dr. Ramírez's experience is particularly relevant because his status as a practicing physician changed in 2000 when he was diagnosed with

CIVIL NO. 08-1236 (JP)           -10-

cancer and left his private practice, and again in 2004 when he chose not to renew his active license. Thus, Plaintiffs' failure to disclose Dr. Ramírez's full current C.V., and failure to supplement their disclosure of the 2004 C.V. with an updated version, was not "substantially justified or harmless." Accordingly, as established by Rule 37(c)(1), Plaintiffs' withholding of Dr. Ramírez's C.V. from Defendants and the Court constituted a sufficient basis for the Court's decision to exclude Dr. Ramírez's testimony.

### 2.   Inadequacy of Dr. Ramírez's Qualifications Pursuant to Rule 702 Standard

Rule 702 of the Federal Rules of Civil Procedure permits opinion testimony by "a witness qualified as an expert by knowledge, skill, experience, training, or education." See Santos v. Posadas De Puerto Rico Associates, Inc., 452 F.3d 59 (1st Cir. 2006). Although Dr. Ramírez has some experience in obstetrics and gynecology, this experience is not adequate to qualify him as an expert witness in this case because in recent years his work has drastically changed. As explained in further detail in the following paragraphs, Dr. Ramirez has transformed from a practicing physician to a professional witness focusing exclusively on testimony on behalf of plaintiffs.

### i.   Bias Toward Plaintiffs

During the Daubert hearing, Dr. Ramírez testified as to his education and training. After receiving a medical degree from the

CIVIL NO. 08-1236 (JP)          -11-

University of Puerto Rico in 1981, Dr. Ramírez pursued an internship and subsequent residency in obstetrics and gynecology.  Dr. Ramírez was certified by the American Board of Obstetrics and Gynecology between 1987 and 1997.   Since 1997, Dr. Ramírez has not been certified by the American Board of Obstetrics and Gynecology. Dr. Ramírez's medical license is currently inactive, and has been inactive since 2004.  Dr. Ramírez testified that he would have to apply to reactivate his license, which would entail satisfying a series of requirements.  In 2000, Dr. Ramírez was diagnosed with cancer and decided to consider cutting back on his active medical practice.  Since 2002, Dr. Ramírez has not treated patients, as an obstetrician or otherwise, and as a matter of fact has not practiced medicine during said time frame.

     Thus, Dr. Ramírez has not been a practicing obstetrician, or physician in any specialty, during the past seven years.  Dr. Ramírez has not been board certified for over ten years.   Instead, Dr. Ramirez informed the Court that he has been doing a variety of consulting work, including consulting as an expert witness in approximately 150 cases.  Dr. Ramírez testified that during the past year, he has worked exclusively on cases in which he writes reports or gives testimony on behalf of plaintiffs.  Dr. Ramírez has not acted as an expert on behalf of a defendant in a single case during the past year.  The Court finds that this track record indicates a bias in favor of Plaintiffs.

CIVIL NO. 08-1236 (JP)            -12-

In addition to his work as an expert witness, Dr. Ramírez has begun collaborating with the distinguished attorney for Plaintiffs in this case, Pedro Soler-Muñiz ("Soler"), to give lectures regarding medical malpractice and EMTALA. Dr. Ramírez testified that he gives such lectures for profit, thereby focusing his work further on assisting plaintiffs who seek to sue doctors and hospitals for various alleged violations of the law. This new business that Dr. Ramirez and Attorney Soler have developed further indicates to the Court that Dr. Ramirez is not an impartial witness. Rather, he has a significant stake in the successful outcome of cases brought by alleged victims of medical malpractice.

In addition, Dr. Ramírez's new line of work seeking clients in medical malpractice cases removes him from being subject to the usual mechanisms for holding physicians accountable for their professional actions. Because Dr. Ramírez has left his license inactive and has not sought to be board certified, he faces no risk of sanctions from any medical disciplinary body. By withdrawing from practice and the corresponding supervision of the licensing board, Dr. Ramírez has set the stage for a line of work in which he need not provide impartial diagnoses of patients. This lack of control casts serious doubt over the degree to which Dr. Ramírez's testimony would be made in the manner to be expected of a responsible physician who is subject to oversight by a medical licensing board.

CIVIL NO. 08-1236 (JP)            -13-

The Court finds that a substantial risk of bias arises when a party proposes to use an expert who focuses on work in legal cases, rather than on active medical practice.  As the Court has stated previously in the case of Rivera Pomales v. Bridgestone Firestone, Inc., 217 F.R.D. 290 (D.P.R. 2003):

> . . . far too frequently in the current legal system the use of professional expert witnesses has become rampant. That is to say, that instead of utilizing professionals that work in a specific field to comment and give learned opinions on certain subjects, attorneys turn to "guns for hire" whose main job or means of living is generated from giving expert testimony.  The Court fears that this trend will result, if it has not already resulted, in supposed experts not utilizing scientific methods to render an opinion but rather by twisting scientific methods to produce a result that will support the case of those footing the bill.  The Court warns the parties that this type of witness will be scrutinized with a highly critical eye in order to preserve the sanctity of the common law legal system.

Id. at 295.  The Court has upheld this principal and finds it to be of critical importance.  In the present case, the Court finds that Dr. Ramírez's testimony is unlikely to be fair and impartial.

In arguing for the adequacy of Dr. Ramírez's qualifications, Plaintiffs' counsel mistakenly placed significant emphasis on the case of Gaydar v. Sociedad Instituto Gineco-Quirúrgico y Planificación, 345 F.3d 15 (1st Cir. 2003).  In Gaydar, the District Court properly exercised its discretion to admit the testimony of a medical expert, and the United States Court of Appeals for the First Circuit affirmed the District Court's ruling.  However, the facts of Gaydar are entirely distinct from the instant case.  In Gaydar, the

CIVIL NO. 08-1236 (JP)            -14-

defendants moved to exclude the testimony of the plaintiffs' expert witness regarding ectopic pregnancies because his medical speciality was in a field other than gynecology or obstetrics.  The District Court determined that practicing in a specialty other than the one about which he intended to testify was not on its own a sufficient reason to exclude the witness' testimony.  By contrast, the instant case does not turn on the particular practice specialty of Dr. Ramírez, but rather on the fact that he does not currently practice medicine at all and instead focuses on work as a lecturer and as a witness for medical malpractice plaintiffs.  Dr. Ramírez now practices a new profession of teaching classes regarding medical malpractice claims against doctors and testifying as an expert for plaintiffs in medical malpractice cases.

### ii.  *Jury Instructions Regarding Expert Testimony*

After two pretrial conferences and extensive discussion and input from counsel for Plaintiffs and Defendants, the Court informed the parties that the jurors in this case would be read instructions at the conclusion of the trial which would include the following information regarding expert testimony:

> The rules of evidence ordinarily do not permit witnesses to testify as to opinions or conclusions. An exception to this rule exists as to those whom we call expert witnesses. Witnesses who, by education and experience, have become expert in some art, science, profession, or calling, may state their opinions as to relevant and material matters, in which they profess to be expert, and may also state their reasons for the opinion.

CIVIL NO. 08-1236 (JP)              -15-

> You should consider each expert opinion received at
> evidence in this case, and give it such weight as you
> think it deserves. If you should decide that the opinion
> of an expert witness is not based upon sufficient
> education and experience, or if you should conclude that
> the reasons given in support of the opinion are not sound,
> or that the witness is not credible, you may choose to
> give the opinion little or no weight in your decision.

These instructions inform the jurors that they may determine the

appropriate weight to give a particular expert's testimony. However,

the instructions also state that the Court will only permit opinion

testimony from "those whom we call expert witnesses."  Thus, the

jurors are made to understand that an expert witness shall not appear

before them unless the Court has determined that the witness is an

individual who, "by education and experience, ha[s] become expert in

[a particular] art, science, profession, or calling."  It is

therefore the Court's responsibility to ensure that jurors do not

hear from an alleged expert who lacks adequate current experience,

and whose work pursuits create a high risk of bias.  Such is the case

with Dr. Ramirez, and accordingly the Court must exclude his proposed

testimony in order to avoid misleading the jury.

     The Court is mindful of its duty to exercise a general

gate-keeping function and to consider all of the factors relevant to

the particular case and the particular qualifications of a proposed

expert.  The Court must carefully exercise its discretion in such

cases.  Upon examining the training and background discussed by

Dr. Ramírez in the <u>Daubert</u> hearing, the Court determines that, for

CIVIL NO. 08-1236 (JP)            -16-

the reasons hereinbefore stated, he is not adequately qualified to testify regarding the medical issues in this case.

**B.   Motion for Judgment as a Matter of Law**

Following the Court's ruling in favor of Defendants' motion to exclude Dr. Ramírez's testimony, Plaintiffs rested their case. Defendants then moved for judgment as a matter of law pursuant to Rule 50(a) of the Federal Rules of Civil Procedure. The Court considered the oral arguments presented by both parties pursuant thereto, and verbally granted Defendants' motion in open court. The Court determined that the evidence presented by Plaintiffs could not support a claim pursuant to either the Emergency Medical Treatment and Active Labor Act ("EMTALA"), or Articles 1802 and 1803 of the Puerto Rico Civil Code, P.R. Laws Ann. tit. 31, sections 5141-42.

**1.   Medical Malpractice**

In order to succeed on their medical malpractice claim under Article 1802 of the Puerto Rico Civil Code, P.R. Laws Ann. tit. 31, section 5141, Plaintiffs bear the burden of establishing, by a preponderance of the evidence: (1) the duty owed; (2) an act or omission transgressing that duty; and (3) a sufficient causal nexus between the breach and the harm. See Rivera v. Turabo Med. Ctr. P'ship, 415 F.3d 162, 167 (1st Cir. 2005). In a medical malpractice case such as this, Puerto Rico law holds physicians to a national standard of care. Cortés-Irizarry v. Corporación Insular de Seguros, 111 F.3d 184 (1st Cir. 1997) (internal citations omitted). As such,

CIVIL NO. 08-1236 (JP)          -17-

a physician has a duty to use the same degree of expertise as could reasonably be expected of a typically competent physician in the identical specialty under identical or similar circumstances, regardless of regional variations in professional acumen or level of care.  Id.

     Puerto Rico law presumes that a doctor observes a reasonable standard of care in treating a patient, so a plaintiff has the burden of refuting this presumption.  Rolón-Alvarado v. Municipality of San Juan, 1 F.3d 74, 78 (1st Cir. 1993).  To do so, the plaintiff must first establish the physician's duty of care.  Because medical knowledge and training are critical to demonstrating the parameters of a physician's duty, the minimum standard of acceptable care is almost always a matter of informed opinion.  Thus, it must ordinarily be established by expert testimony.  Id., citing Oliveros v. Abreu, 1 P.R. Offic. Trans. 293, 315 (1973); see also Lama v. Borras, 16 F.3d 473, 478 (1st Cir. 1994) (holding that "the trier of fact can rarely determine the applicable standard of care without the assistance of expert testimony").

     In the instant case, Plaintiffs allege that the duty to provide the minimum requisite standard of care was breached by Defendants Dr. Torres, Dr. Gómez, Mennonite, and Advanced OB-GYN, PSC.  In the absence of an expert witness, Plaintiffs' case in chief lacked evidence to inform the jury regarding the appropriate standard of medical care.  Plaintiffs presented evidence from six fact witnesses,

CIVIL NO. 08-1236 (JP)          -18-

but none offered an informed discussion of the relevant standards of medical care. Without such information, the jury could not determine whether said standard of care was breached by Defendants. Accordingly, Plaintiffs did not meet their burden on their medical malpractice claim, and a Rule 50(a) judgment as a matter of law for Defendants is appropriate.

> **2.   EMTALA**

> **i.   *Requirements Established by the EMTALA Statute***

The EMTALA statute requires, *inter alia*, that hospitals provide adequate screening and stabilization of patients suffering from an emergency medical condition. 42 U.S.C. § 1395dd. The two basic requirements of the statute are:

> First, "if any individual . . . comes to the emergency department [of a covered hospital] and a request is made on the individual's behalf for examination or treatment for a medical condition, the hospital must provide for an appropriate medical screening examination." [42 U.S.C.] § 1395dd(a). Second, if the screening examination discloses that the individual suffers from an emergency medical condition, the hospital must provide necessary stabilization. *See id.* § 1395dd(b)(1).

Morales v. Sociedad Española de Auxilio Mutuo y Beneficencia, 524 F.3d 54 (1st Cir. 2008). The statute defines an emergency medical condition as follows:

> . . . with respect to a pregnant woman who is having contractions– (i) that there is inadequate time to effect a safe transfer to another hospital before delivery, or (ii) that transfer may pose a threat to the health or safety of the woman or the unborn child.

42 U.S.C. § 1395dd(e)(B).

CIVIL NO. 08-1236 (JP)          -19-

    Although the EMTALA statute does not define what constitutes an

appropriate medical screening examination, the United States Court

of Appeal for the First Circuit has established that:

> A hospital fulfills its statutory duty to screen patients
> in its emergency room if it provides for a screening
> examination reasonably calculated to identify critical
> medical conditions that may be afflicting symptomatic
> patients and provides that level of screening uniformly to
> all those who present substantially similar complaints.
>
> The essence of this requirement is that there be some
> screening procedure, and that it be administered
> even-handedly. When a hospital prescribes internal
> procedures for a screening examination, those internal
> procedures set the parameters for an appropriate
> screening.   A hospital thus must adhere to its own
> procedures in administering the screening examination.

Cruz-Queipo v. Hospital Español Auxilio Mutuo de Puerto Rico,

417 F.3d 67 (1st Cir. 2005) (internal citations omitted).  Thus, a

key question in EMTALA cases is often whether or not the hospital

followed its own established protocols.

> ### ii.  *Insufficiency of Evidence Presented in Witness Testimony and Uncontested Facts to Support a Claim Under EMTALA*

    In the instant case, Plaintiffs allege that Defendant Mennonite

violated EMTALA by failing to provide an adequate screening and

stabilization of Plaintiff Cruz on January 4, 2007.  In particular,

Plaintiffs allege that Cruz was suffering from bleeding during her

third trimester of pregnancy, which, pursuant to the hospital's own

policies, requires activation of a protocol to assess the cause of

the bleeding, to determine whether the patient may be entering into

CIVIL NO. 08-1236 (JP)              -20-

premature labor and to provide appropriate treatment.  The parties
agree in their uncontested facts that this protocol was not activated
by Defendant Mennonite.    Plaintiffs argued, in opposition to
Defendants' motion for judgment as a matter of law, that the jury
could adequately assess the EMTALA claim on the basis of the evidence
presented by Plaintiffs' fact witnesses, and the uncontested facts
agreed to by the parties.

     The uncontested facts in this case were agreed to by the parties
during the Initial Scheduling Conference ("ISC") held on June 27,
2008.    The purpose of the ISC is to maximize efficiency in
litigation.  The federal docket is replete with costly, complex and
time consuming litigation. Therefore, the undersigned is a firm
believer in the necessity to take an active role in ensuring that
cases that come before him are litigated in an efficient and just
manner. See Judicial Economy and Efficiency Through the Initial
Scheduling Conference: The Method, 35 Cath. U.L. Rev. 943 (1986)
authored by the undersigned Judge; see also The Civil Justice Reform
Act, codified at 28 U.S.C.A. §§ 471-482 (West 1993), and the Civil
Justice Reform Act's Recommendation by the Civil Justice Reform Acts'
Committee which the undersigned chaired and the various orders of the
Court entered pursuant thereto. The importance of this Court's ISC
and its resulting Order in general is to streamline and simplify this
litigation, and reduce the cost and delay that so frequently
characterizes it.

CIVIL NO. 08-1236 (JP)           -21-

    Contrary to Plaintiffs' assertions, the evidence presented in
this case through the uncontested facts and the testimony of
Plaintiffs' witnesses was not sufficient to support a jury verdict
for Plaintiffs on their EMTALA claim.  As with the duty of care in
a medical malpractice cause of action, a full understanding of
whether a patient has entered into an emergency medical condition for
the purposes of EMTALA would require specialized scientific testimony
from a medical expert.

    For example, determination of the factual issue of whether or
not Plaintiff Cruz was experiencing "bleeding" for purposes of the
hospital's protocol would require an explanation based on the
informed opinion of a qualified physician.  The parties agree in the
uncontested facts that when Cruz arrived at Mennonite, she had
experienced "occasional blood spotting within the prior half hour."
The Merriam Webster Medical Dictionary defines "spotting" as "to
experience abnormal and sporadic bleeding in small amounts from the
uterus."[1] Neither the Court, nor the jury, is qualified to determine
whether the meaning of bleeding as stated in the hospital's protocol
encompasses a blood discharge that occurred only prior to arrival at
the hospital, and which was sporadic and in small amounts.  Only a
qualified expert witness could adequately explain such medical
terminology to the jurors.

_____

1.    Merriam Webster Medical Dictionary Online Edition, available at
      http://www2.merriam-webster.com/cgi-bin/mwmednlm?book=Medical&va=spotting.

CIVIL NO. 08-1236 (JP)          -22-

Given that the Court excluded the testimony of Plaintiffs' medical expert, Plaintiffs are unable to demonstrate the necessary elements of their EMTALA claim.  Without such expert testimony, the jurors could not reliably determine whether or not Plaintiff Cruz was demonstrating the symptoms that require activation of Mennonite's protocol for patients with bleeding during the third trimester of pregnancy.  This is particularly so in view of the medical findings by Plaintiff Cruz's treating physicians who determined that her symptoms did not warrant activation of the protocol.  Accordingly, the Court also dismissed Plaintiffs' EMTALA claim with prejudice.

## III. **CONCLUSION**

In conclusion, the Court has granted Defendants' motion to exclude the testimony of Plaintiffs' proposed expert witness, Dr. Ramírez, and has granted Defendants' motion for judgment as a matter of law pursuant to Rule 50(a).  A separate Judgment will be entered accordingly.

**IT IS SO ORDERED**.

In San Juan, Puerto Rico, this 15th day of April, 2009.

<u>     s/Jaime Pieras, Jr.     </u>
JAIME PIERAS, JR.
U.S. SENIOR DISTRICT JUDGE