IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| HAZEL I. CRUZ-VAZQUEZ, et al.,<br><br>Plaintiffs<br><br>v.<br><br>MENNONITE GENERAL HOSPITAL, INC., et al.<br><br>Defendants | CIVIL NO. 08-1236 (JP) |

**OPINION AND ORDER**

Before the Court is Defendants' motion for summary judgment (**No. 112**) and Plaintiffs' opposition thereto (No. 116). On February 25, 2008, Plaintiffs brought the instant action pursuant to the Emergency Medical Treatment and Active Labor Act ("EMTALA"), 42 U.S.C. § 1395dd, and Articles 1802 and 1803 of the Puerto Rico Civil Code, P.R. Laws Ann. tit. 31, §§ 5141-42. Plaintiffs allege that Defendants' medical malpractice and violation of EMTALA caused Plaintiff Hazel Cruz-Vazquez ("Cruz") to give birth to a premature baby girl whose incomplete development resulted in respiratory complications that caused the baby's death within two days after she was born. For the reasons herein, Defendants' motion is **DENIED.**

By way of background, a jury trial was held in this case commencing on March 30, 2009. Plaintiffs presented the testimony of several witnesses, including the testimony of Dr. Carlos E. Ramirez ("Dr. Ramirez"), Plaintiffs' expert witness. On April 2, 2009,

CIVIL NO. 08-1236 (JP)          -2-

Defendants moved to exclude the testimony of Dr. Ramirez, which the Court granted. Thereafter, Plaintiffs rested their case, and Defendants moved for judgment as a matter of law pursuant to Rule 50(a) of the Federal Rules of Civil Procedure, which the Court also granted (No. 93). On August 2, 2010, the First Circuit Court of Appeals vacated the judgment of the Court and remanded the case for further proceedings consistent with the Opinion (No. 103).

I.      **MATERIAL FACTS NOT IN GENUINE ISSUE OR DISPUTE**

The following material facts ("ISC UMF") were deemed uncontested by all parties hereto at the Initial Scheduling Conference held on June 27, 2008 (No. 34).

1.   Defendant Mennonite General Hospital, Inc. ("Mennonite") is a medical institution subject to EMTALA.

2.   Plaintiffs sent a letter dated December 27, 2007, to Defendants Mennonite and Defendant Dr. Eduardo Gomez ("Dr. Gomez") via certified mail, which was received on January 2, 2008.

3.   Defendant Dr. Brenda Torres ("Dr. Torres") is a physician, fully authorized to practice medicine in the Commonwealth of Puerto Rico, who has been granted privileges to do work in the emergency room by co-Defendant Mennonite. She is employed by RMB Corp. Dr. Torres is of legal age, married to Amílcar Vélez and resident of Road 176, Camino Dr. Juliá, Cupey Alto, San Juan, Puerto Rico.

CIVIL NO. 08-1236 (JP)         -3-

4. Defendant Dr. Gomez is an obstetrician and gynecologist duly authorized to practice medicine in the Commonwealth of Puerto Rico who had privileges to practice in all the medical facilities of Defendant Mennonite at the times subject of this case. Dr. Gomez is an obstetrician and gynecologist with a private medical office located at El Jíbaro Avenue, Parque Industrial, Centro de Salud Menonita, Suite 101, Cidra, Puerto Rico.

5. Defendant Dr. Gomez is Plaintiff Cruz's primary OB-GYN physician and was not an employee of Mennonite at the time of the alleged facts.

6. Defendant Advanced OB-GYN, PSC is a Professional Services Corporation of which Defendant Dr. Gomez is an owner and/or president and/or shareholder for the practice of obstetrics and gynecology. It is a legal entity authorized and with operations under the laws of the Commonwealth of Puerto Rico.

7. Plaintiff Cruz became a patient of Dr. Gomez for her prenatal care on August 10, 2006. Cruz was further seen by Dr. Gomez for prenatal care on August 24, August 26, September 26, October 10, October 24, November 21, and December 19, 2006; and on January 4, 2007.

CIVIL NO. 08-1236 (JP)          -4-

8. Cruz's prenatal care and progress was completely uneventful, including her regular visit on January 4, 2007 at 2:00 p.m.

9. At said visit, on January 4, 2007, Dr. Gomez wrote in a progress note that Cruz had a blood pressure of 120/70, the fetal cardiac rhythm was present, she was twenty-seven weeks and four days pregnant, with a fundal height of thirty centimeters, with no vaginal bleeding, no vaginal "D/C," no suprapubic pain, no lower back pain, and with an active fetus.

10. Cruz's estimated date of labor was April 1, 2007, as per Dr. Gomez's medical record.

11. As per the medical records, during prenatal care the laboratory results were normal.

12. On January 4, 2007, Plaintiff Cruz, the only plaintiff who requested medical services on January 4, 2007 at Mennonite in Cidra, arrived to the emergency room of Mennonite in Cidra at 10:15 p.m. with complaints of vaginal discharge and occasional blood spotting within the prior half hour. Cruz denied pelvic pain, dysuria, or fever, and was feeling fetal movements.

13. Cruz was evaluated by Dr. Torres, who performed a vaginal or pelvic exam on Plaintiff Cruz and found that the cervix was not dilated.

CIVIL NO. 08-1236 (JP)            -5-

14. Dr. Torres provided certain medical care and treatment to Plaintiff Cruz on January 4 and 5, 2007, at Mennonite, as per the medical record.

15. Cruz was with 27 4/7 weeks of gestation and was in her third trimester.

16. As per the medical record, Dr. Torres called Dr. Gomez, Cruz's obstetrician, at 10:55 p.m. to speak to him about Dr. Torres' examination of Cruz. Dr. Gomez advised Dr. Torres to administer Bretine 0.25 and Vistaryl 50mg, to discharge Cruz in stable condition, and to instruct her to follow-up at Dr. Gomez's private office on the morning of January 5, 2007 at 8:00 a.m., instructions which were followed.

17. As per Mennonite's medical record, there is one annotation stating "FHR = 160." A nurse's note in the medical record states that Plaintiff Cruz was re-evaluated at 12:15 a.m. by "M.D." who ordered discharge on January 5, 2007, to have a follow-up with OB-GYN.

18. According to the medical record, Cruz was sent home on January 5, 2007, at 12:15 a.m., less than two hours after her arrival. Cruz's condition was recorded on the medical record as "discharge condition stable."

CIVIL NO. 08-1236 (JP)          -6-

19. On January 5, 2007 at 8:14 a.m., Cruz was seen by Dr. Gomez at his office. She complained of blood spotting since the previous night but no pain.

20. A pelvic evaluation of Cruz revealed normal genitalia, no masses in the bartolin urethra skinny gland, no infection, no neoplasia, and no trauma.

21. A blood collection (pool) was found in the vagina. Cruz was also found to be dilated seven (7) centimeters with bulging membranes and the baby floating in breech position. The fetal cardiac rhythm was 142 beats per minute.

22. Dr. Gomez determined that Cruz was suffering from an incompetent cervix. Cruz and her mother, Plaintiff Lucy Vázquez-Rivera, were oriented as to Cruz's and the baby's condition, diagnosis and prognosis, and the need for transfer to Puerto Rico Medical Center. Both agreed to the transfer.

23. Dr. Gomez was informed that Dr. Gracia at University District Hospital, Puerto Rico Medical Center would accept Cruz, and Cruz was transferred in stable condition from Dr. Gomez's office with orders.

24. Plaintiff Cruz was admitted to the San Juan City Hospital, where a cesarean section was done due to the prematurity of the baby.

CIVIL NO. 08-1236 (JP)          -7-

25. Cruz's baby was born at 12:12 p.m. on January 5, 2007 and was a living baby girl, APGAR 3/5 with a weight of two pounds fourteen ounces.

26. The baby died on January 7, 2007 at 7:57 a.m.

27. On the date of the facts of this case, Mennonite had in place and in full force and effect in all of its facilities a "Gravid with 3rd Trimester Bleeding" Protocol requiring the following tests to be performed on the patient:

   A. 3rd trimester bleeding must be differentiated from bloody show by speculum exam;

   B. The most likely diagnosis of 3rd trimester bleeding is placenta previa or abruption;

   C. The gestational age must be determined;

   D. Look for rupture of membranes;

   E. Fetal movements;

   F. Fetal heart rate tones by Doppler must be measured;

   G. Vital signs as blood pressure, pulse, and temperature must be acquired;

   H. The following laboratories must be practiced:

      (1) CBC

      (2) Urinalysis

      (3) Serology

      (4) PT, PTT

CIVIL NO. 08-1236 (JP)          -8-

>   (5)  Platelet count
>   
>   (6)  T & Screen or T & Cross match
>   
>   (7)  Serum fibrinogen, fibrin split product of hemorrhage only if > B/P (preeclampsia, eclampsia).
> 
> I.  Open a vein with a catheter;
> 
> J.  Start Ringer lactate at 125 cc/hr;
> 
> K.  Send patient to LR in stretcher.

28. Mennonite failed to activate Mennonite's "Gravid with 3rd Trimester Bleeding" Protocol in this case.

29. Cruz visited the office of Dr. Gomez for postpartum management on January 18, 2007, with clean and dry wound secondary to cesarean section, and diagnosis of incompetent cervix, neonatal death, and for contraceptive counseling. The diagnosis of incompetent cervix was made by Dr. Gomez.

30. Cruz again visited the office of Dr. Gomez for postpartum management on February 15, 2007 for a postpartum routine visit and contraceptive counseling and prescription.

31. On March 1, 2007, Cruz visited the office of Dr. Gomez when normal pap smear results were given.

The following facts are deemed uncontested ("UMF") by the Court because they were included in the motion for summary judgment and

CIVIL NO. 08-1236 (JP)          -9-

opposition and were either agreed upon, or they were properly supported by evidence and not genuinely opposed.

1. Incompetent cervix is a diagnosis that is given to the patient who has had two or more pregnancy losses in the second trimester of pregnancy.
2. Incompetent cervix is the inability of the cervix to retain a pregnancy in the absence of contractions or labor.
3. An incompetent cervix is a condition that can appear suddenly.
4. The patient Cruz denied having pelvic pain, dysuria nor fever upon arrival at the Emergency Room of Mennonite.
5. The patient Cruz felt fetal movement upon arrival at the Emergency Room of Mennonite.
6. The patient was alert and oriented in time, place and space while at the Emergency Room of Mennonite in Cidra.
7. Upon pelvic examination Dr. Torres found that the cervix was not dilated.
8. Dr. Torres called the patient's obstetrician, and that was the correct thing to do.
9. Dr. Gomez was correct when he ordered Dr. Torres to give Brethine .25, Vistaril and follow up in the morning. These orders were carried out.

10. After her discharge from the Emergency Room, the patient Cruz went home. That night, Cruz did not feel any pelvic pain; did not notice any bleeding; and felt fetal movement.

11. Contractions are uterine movements, which are not always accompanied by pain. However, they are more likely than not painful.

12. The patient Cruz never complained of having pain.

13. A diagnosis of Incompetent Cervix is done after the fact, and cannot be made on a patient's first pregnancy.

14. An obstetrician cannot anticipate that a patient will have an incompetent cervix in her first pregnancy.

15. A mucous vaginal discharge is not an hemorrhage.

16. Cruz did not present any risk factor nor any medical condition that would predict incompetent cervix.

## II.  **LEGAL STANDARD FOR A MOTION FOR SUMMARY JUDGMENT**

Summary judgment serves to assess the proof to determine if there is a genuine need for trial. Garside v. Osco Drug, Inc., 895 F.2d 46, 50 (1st Cir. 1990). Pursuant to Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment is appropriate when "the record, including the pleadings, depositions, answers to interrogatories, admissions on file, and affidavits, viewed in the light most favorable to the nonmoving party, reveals no genuine issue as to any material fact and the moving party is entitled to judgment

CIVIL NO. 08-1236 (JP)          -11-

as a matter of law." Fed. R. Civ. P. 56(c); see also Zambrana-Marrero v. Suárez-Cruz, 172 F.3d 122, 125 (1st Cir. 1999) (stating that summary judgment is appropriate when, after evaluating the record in the light most favorable to the non-moving party, the evidence "fails to yield a trial worthy issue as to some material fact"); Goldman v. First Nat'l Bank of Boston, 985 F.2d 1113, 1116 (1st Cir. 1993); Canal Ins. Co. v. Benner, 980 F.2d 23, 25 (1st Cir. 1992). The Supreme Court has stated that "only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 2510, 91 L. Ed. 2d 202 (1986). In this way, a fact is material if, based on the substantive law at issue, it might affect the outcome of the case. See Mack v. Great Atl. and Pac. Tea Co., Inc., 871 F.2d 179, 181 (1st Cir. 1989).

On a summary judgment motion, the movant bears the burden of "informing the district court of the basis for its motion and identifying those portions of the [record] which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S. Ct. 2548, 2253, 91 L. Ed. 2d 265 (1986). Once the movant meets this burden, the burden shifts to the opposing party who may not rest upon mere allegations or denials of the pleadings, but must affirmatively show,

CIVIL NO. 08-1236 (JP)        -12-

through the filing of supporting affidavits or otherwise, that there is a genuine issue of material fact for trial. See Anderson, 477 U.S. at 248, 106 S. Ct. at 2510; Celotex, 477 U.S. at 324, 106 S. Ct. at 2553; Goldman, 985 F.2d at 1116.

### III. ANALYSIS

Defendants argue that summary judgment is appropriate in this case because Plaintiffs have not provided evidence sufficient to support a finding that Defendants failed to provide an appropriate medical screening to Cruz in violation of EMTALA. Defendants argue that Cruz was appropriately evaluated by Dr. Torres, that Dr. Torres consulted Cruz's obstetrician, who recommended a treatment, which was followed. Defendants also contend that Cruz did not have an emergency medical condition upon arriving at the emergency room and that she was discharged in a stable condition. The Court will consider Defendants' arguments in turn.

#### A.   **Plaintiffs' EMTALA Claims**

Plaintiffs allege that Defendants violated EMTALA by failing to provide Cruz with an appropriate medical screening. EMTALA is an "anti-dumping" statute which was enacted by Congress in response to concern about the increasing number of reports that emergency rooms were refusing to accept or treat uninsured patients with emergency medical conditions. Correa v. Hospital San Francisco, 69 F.3d 1184, 1189 (1st Cir. 1995) (internal citation omitted). EMTALA was not intended to be a federal medical malpractice statute,

CIVIL NO. 08-1236 (JP)           -13-

but rather a federal law that provided a remedy for emergency care patients where state malpractice provisions fell short.  Correa, 69 F.3d at 1192; see Reynolds v. Maine Gen. Health, 218 F.3d 78, 83 (1st Cir. 2000).

The statute imposes two categories of obligations upon hospitals.  First, it requires that hospitals provide an appropriate medical screening to all individuals who come to the hospital's emergency room seeking assistance.  42 U.S.C. § 1395dd(a); Correa, 69 F.3d at 1190.  Second, EMTALA requires that if an emergency medical condition exists, the hospital must render the services that are necessary to stabilize the patient's condition, unless transferring the patient to another facility is medically indicated and can be accomplished with relative safety.  See 42 U.S.C. § 1395dd(b); Correa, 69 F.3d at 1190.

A plaintiff can bring a cause of action under either the screening or stabilization provisions of EMTALA, or both.  See Benítez-Rodríguez v. Hosp. Pavía Hato Rey, Inc., 588 F. Supp. 2d 210, 214 (D.P.R. 2008).  The United States Court of Appeals for the First Circuit has outlined a three-pronged standard to establish an EMTALA violation.  Correa, 69 F.3d at 1190.  In order to prevail on an EMTALA claim, a plaintiff must show that (1) the hospital is a participating hospital, covered by EMTALA, that operates an emergency department; (2) the plaintiff arrived at the facility seeking treatment; and (3) the hospital either (a) did not afford the patient

CIVIL NO. 08-1236 (JP)            -14-

an appropriate screening in order to determine if she had an emergency medical condition, or (b) bade farewell to the patient (whether by turning her away, discharging her, or improvidently transferring her) without first stabilizing the emergency medical condition.  Id. (citing Miller v. Med Ctr. of S.W. La., 22 F.3d 626, 628 (5th Cir. 1994); Stevison v. Enid Health Sys., Inc., 920 F.2d 710, 712 (10th Cir. 1990)).

The parties hereto do not contest the first two requirements. That is, Cruz arrived at the emergency room of Mennonite, a participating EMTALA facility, seeking medical care. Plaintiffs' claims turn on the third prong: whether Mennonite failed to provide an appropriate screening.

### 1. *Appropriate Medical Screening*

Although EMTALA does not define what appropriate medical screening entails, the case law has defined this duty as providing an examination "reasonably calculated to identify critical medical conditions that may be afflicting symptomatic patients and provides that level of screening uniformly to all those who present substantially similar complaints." Correa, 69 F.3d at 1192; see Guadalupe v. Negrón-Agosto, 299 F.3d 15, 20 (1st Cir. 2002).

A plaintiff must show that the screening that he or she received failed to comply with the standard screening policy that the hospital "regularly follows for other patients presenting substantially similar conditions." Malavé Sastre v. Hospital Doctor's Ctr.,

CIVIL NO. 08-1236 (JP)          -15-

93 F. Supp. 2d 105, 109-10 (D.P.R. 2000) (Pieras, J.) (noting that "an 'appropriate' screening is properly determined not by reference to particular outcomes, but instead by reference to a hospital's standard screening procedures"); see Correa, 69 F.3d at 1192 ("[t]he essence of this requirement is that there be some screening, and that it be administered evenhandedly").

In this case, Plaintiff Cruz arrived at the emergency room of Mennonite around 10:15 p.m. complaining of vaginal discharge and blood spotting and requesting medical services (ISC UMF 12). At that time, Cruz was in her third trimester of pregnancy, at 27 4/7 weeks (ISC UMF 15). Upon her arrival, Cruz was evaluated by Dr. Torres who performed a vaginal or pelvic exam on Cruz; Dr. Torres found that Cruz's cervix was not dilated (ISC UMF 13). Thereafter, Dr. Torres called Cruz's obstetrician, Dr. Gomez, who advised that Dr. Torres should administer Bretine and Vistaryl so that Cruz could be discharged in a stable condition (ISC UMF 16). Dr. Gomez also advised that Cruz should follow-up the next morning at Dr. Gomez's private office (ISC UMF 16). The parties stipulate that these instructions were followed (ISC UMF 16). Cruz was sent home at 12:15 a.m., less than two hours after her arrival at the emergency room (ISC UMF 18).

The next morning, the record shows that Cruz was examined by Dr. Gomez at his office around 8:14 a.m. and was complaining of blood spotting, which had been occurring since the previous night (ISC UMF 19). Upon examining Cruz, Dr. Gomez found a blood collection pool in

CIVIL NO. 08-1236 (JP)          -16-

Cruz's vagina, and found that Cruz was dilated seven (7) centimeters with bulging membranes (ISC UMF 21). He also found that the baby was floating in the breach position and that the fetal cardiac rhythm was 142 beats per minute (ISC UMF 21). Thereafter, Cruz was transferred to the San Juan City Hospital where a cesarean section was performed and Cruz's baby was born prematurely, with a weight of two pounds and fourteen ounces (ISC UMFs 24, 25). The baby died two days later on January 7, 2007 (ISC UMF 26).

In their motion, Defendants argue that Cruz did not have an emergency medical condition as defined by EMTALA when she arrived at the emergency room, and therefore, summary judgment is appropriate. The Court finds this argument untenable. To prevail on an EMTALA claim for failure to provide appropriate screening, Plaintiffs need only prove that Defendants did not afford Cruz an appropriate screening in order to determine if she had an emergency medical condition, and not whether or not she actually had an emergency medical condition. See 42 U.S.C. § 1395dd(a); Correa, 69 F.3d at 1190. As the First Circuit clarified, "[t]he failure appropriately to screen, by itself, is sufficient to ground liability as long as the other elements of the cause of action are met." Correa, 69 F.3d at 1190.

According to the facts stipulated to by the parties, Mennonite had in place a "Gravid with 3rd Trimester Bleeding" protocol, which required certain tests to be performed (ISC UMF 27). The protocol

CIVIL NO. 08-1236 (JP)          -17-

explicitly stated that "3rd trimester bleeding must be differentiated from bloody show by speculum exam." From the facts presented, it appears that no such exam was performed on Cruz. Dr. Gomez performed only a pelvic exam. Moreover, the protocol specified that certain laboratory studies must be performed, including CBC, urinalysis, serology, platelet count, among other laboratory studies (ISC UMF 27). Plaintiffs' expert witness, Dr. Ramirez, found that Cruz did not receive a CBC as required by Mennonite's "Gravid with 3rd Trimester Bleeding" protocol (Pl.'s Exh. 5). Dr. Ramirez concluded that, in his opinion, Cruz's preterm labor was caused by decidual or placental infection and that this would have been detected and prevented if a CBC had been done (Pl.'s Exh. 5).

    The Court finds that, in this case, Defendant Mennonite had a standard screening procedure, its "Gravid with 3rd Trimester Bleeding" protocol, which required certain tests to be performed and which Mennonite denied to Cruz. The protocol specified that a likely diagnosis of 3rd trimester bleeding is placenta previa or abruption and that the doctor should look for rupture of the membranes (ISC UMF 27). Cruz was given a cursory pelvic examination and, less than two hours after being admitted to the emergency room for complaints of bleeding during her third trimester, she was given some medications and sent home.

    After considering the evidence presented and Defendants' arguments, the Court finds that Plaintiffs have presented sufficient

CIVIL NO. 08-1236 (JP)          -18-

evidence for a reasonable jury to conclude that Defendants' conduct in failing to apply its "Gravid with 3rd Trimester Bleeding" protocol to Cruz violated EMTALA.

### B. Plaintiffs' State Law Claims

Defendants also move for the dismissal of Plaintiffs' state law claims. The Court will exercise supplemental jurisdiction over Plaintiffs' state law medical malpractice claims because Plaintiffs' federal law EMTALA claims are still appropriately before this Court. See Newman v. Burgin, 930 F.2d 955, 963 (1st Cir. 1991) ("[t]he power of a federal court to hear and determine state law claims in non-diversity cases depends upon the presence of at least one substantial federal claim in the lawsuit").

### IV. CONCLUSION

In conclusion, the Court **DENIES** Defendants' motion for summary judgment as to Plaintiffs' EMTALA claims and **DENIES** Defendant's motion requesting dismissal of Plaintiffs' state law claims.

**IT IS SO ORDERED.**

In San Juan, Puerto Rico, this 15th day of August, 2011.

                                        S/ JOSÉ ANTONIO FUSTÉ
                                        JOSÉ ANTONIO FUSTÉ
                                     UNITED STATES DISTRICT JUDGE